UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WILLIAM MOORE | CIVIL ACTION |
| VS. | NO. 2:10-cv-00311 |
| OMEGA PROTEIN CORPORATION AND M/V RACCOON POINT | JUDGE ENGELHARDT MAGISTRATE ROBY |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN OPPOSITION TO
## MOTION FOR NEW TRIAL

MAY IT PLEASE THE COURT:

The present Memorandum is filed on behalf of Defendants, Omega Protein, Inc. and M/V RACCOON POINT ("Omega"), in opposition to the Motion for New Trial (Doc. 68) filed by Plaintiff, William Moore ("Moore"). For the reasons which follow, the Motion for New Trial should be denied.

### BACKGROUND FACTS

The present case arises from an accident which occurred on August 8, 2008, when Moore got his right foot tangled in a line aboard F/V RACCOON POINT while the vessel was entering Freshwater Bayou locks. Moore filed suit seeking damages under the Jones Act and for unseaworthiness. The case was tried before a jury between January 10 and January 12, 2011. At the conclusion of the trial the jury rendered a verdict, finding that Moore's accident and injuries were not due to negligence of the Master or crew or unseaworthiness of the vessel. From this verdict, Moore has filed a Motion for New Trial.

The Motion for New Trial should be denied because the jury's verdict was reasonable considering the facts, was supported by competent evidence and was not "against the great weight of the evidence."

## A.  The Evidence At Trial

On the date of Moore's accident, August 8, 2008, F/V RACCOON POINT was entering the Freshwater Bayou locks, with Moore manning the starboard side of the vessel toward the bow. He was stationed there in order to moor that end of the vessel to the locks' piling using the vessel's spring starboard line. Moore wrapped one end of the rope around the piling while the vessel was still drifting, before Captain Freddie Newton reversed the engine to stop the vessel. While the vessel was still drifting, Moore then placed the other end of the rope around the bit on the vessel. As he was securing the rope to the bit, the vessel continued to drift and take up slack in the rope. Through inattention or inadvertence, Moore's right leg became entrapped in the bight (coil) of the rope on the deck and was pulled toward the bit as the rope tightened. The bottom portion of Moore's right leg was trapped between the rope and the forward starboard bit, injuring his leg.

The evidence at trial showed that Moore's accident occurred as the result of his own failure to adhere to Omega's safety policies and procedures and his inattentiveness to duty at the time of his accident, not as a result of any actions or inactions on the part of Omega or the condition of F/V RACCOON POINT. Captain Newton testified at trial that Moore should not have attached the line to the piling and the bit on the vessel while the vessel was still drifting and before Captain Newton reversed the engines to back down the vessel. Had Moore waited until the proper time to attach the mooring rope, the rope would not have been pulled out and Moore's leg would not have become entrapped.

The evidence showed that Moore certainly knew the proper procedure for safely mooring a vessel. Moore was shown to be a fifty-four (54) year old menhaden fisherman who worked at that occupation for his entire life. He had approximately thirty (30) years of experience as a menhaden fisherman at the time of his accident, at least fourteen (14) years of which were with Omega. He knew the proper manner in which to tie the vessel. He knew that he should have waited until the vessel was in position before attempting to tie it off. He also knew the "golden rule" of handling mooring lines on a vessel, "watch out for the bight in the rope."

At trial the jury was presented with a wealth of evidence that Moore's accident was caused by his own inattention while performing an operation, mooring the vessel, which he was very familiar with. Moore testified that he was familiar with the "Fisherman's Ten Commandments for Safety," which contains a commandment that a person, such as Moore, when handling a line, has a duty to keep his hands and feet clear of the rope. Moore's testimony, both at trial and in his post-accident statement, showed that he knew and understood the risk of getting his legs caught in a rope when mooring a vessel.

The jury also considered Moore's August 11, 2008 recorded statement, which was given only three (3) days following his accident. In the statement Moore admitted that he had ample experience as a fisherman and he had successfully performed this same operation of tying up a vessel in locks many times before. He stated that his leg just "got wrapped in the rope by accident." Several times in his statement Moore confirmed that he had extensive experience in this kind of operation but that this incident was "just an accident." It would not have been unreasonable for the jury to have simply agreed with Moore's own statement, that the accident resulted from Moore's own simple mistake.

At trial, Moore argued three alleged acts of negligence on the part of the master and crew of F/V RACCOON POINT, none of this were proven. First, Moore argued that the vessel was being piloted too fast while entering the Freshwater Bayou Locks. Second, Moore argued that Omega should have deployed a "spotter" to assist in bringing the vessel into the locks and to watch for potential mistakes by Moore. Third, Moore argued that there was a "kink" in the line, causing Moore's leg to get entrapped. None of these theories was proven, and all were reasonably rejected by the jury.

The evidence presented to the jury demonstrated that the vessel was piloted appropriately as it entered Freshwater Bayou Locks. The actual evidence at trial exposed the "fast entry" as a mere theory. The evidence showed that, at the time F/V RACCOON POINT entered the locks, there were three other vessels in the locks. Although the vessel was operating in a very tight and confined space, F/V RACCOON POINT did not strike the other vessel and did not contact the structure of the locks. It was also explained that the Lock Master kept tight control over the movements of the vessels in and around the locks, and he did not reprimand Captain Newton for proceeding too fast. Moore's claim at trial that F/V RACCOON POINT entered the locks too fast was shown to be unsupported and unbelievable. The fact that the mooring line was pulled out was a result of Moore attaching the line too soon, before the vessel was in position, not because of some improper entry speed. If the vessel had entered the locks too fast it would have certainly struck the vessel in front of it, or the lock structure itself. None of this occurred.

The jury considered that Captain Freddy Newton had a lifetime of experience piloting fishing vessels, such as F/V RACCOON POINT, and had passed through the locks countless times. Captain Newton was a very credible witness with extensive experience. The jury was able to evaluate his credibility and they obviously accepted his testimony. There is no factual or

legal basis for any argument that the jury could not have believed and credited Captain Newton, and found that he was piloting the vessel appropriately at the time of the accident.

Moore also argues that the jury should have given more weight to the testimony of his retained expert witness, Captain Mitchell Stoller. As the jury was instructed in this case, there is no requirement that the testimony of an expert witness be accepted. Like any other witness, it is within the province of the jury to determine the weight to be given to the testimony of an expert. In this case, the jury also had good reason to reject Captain Stoller's theories about the case. As the jury learned at trial, Captain Stoller's maritime experience was mainly with oil supertankers, which have virtually no resemblance to relatively small pogey fishing vessels such as F/V RACCOON POINT. Captain Stoller had never piloted a vessel through the Freshwater Bayou Locks and had no experience with a similar operation. There is no reason why a jury must have believed Captain Stoller over Captain Newton. The fact that the jury rejected the opinions of Captain Stoller is not a ground upon which a new trial must be granted.

Moore's argument that there should have been a "spotter" on the job was properly rejected. Moore admitted in his statement that the job he was performing at the time of his accident was a one-man operation. No additional crew was required to assist Moore in tying the line. Furthermore, there was no evidence that a "spotter" would have prevented the accident. At trial Moore presented testimony from Wesley Kelly, another crew member on F/V RACCOON POINT at the time of the accident. Despite the fact that Kelly was standing a mere five feet away from Moore at the time of the accident, Kelly did not yell or warn Moore of any impending problem. Kelly first noticed a problem when Moore was attempting to shake his foot free of the line after it was caught. The jury was left to wonder how an additional "spotter" could have altered the course of events. If another crew member standing five feet away, and paying

attention to the operation, didn't see anything dangerous before the accident, how can anyone conclude that a specifically assigned "spotter" would have seen anything else? The Plaintiff did not really explain at trial how a "spotter" would have changed the facts of the accident in this case. There is no duty on the part of Omega Protein to have someone stand over each rope handler like an umpire behind home plate in baseball. The "spotter" theory was appropriately rejected by the jury.

The jury also appropriately rejected the "kink in the line" theory. As the jury learned during trial, one of the primary safety obligations of a rope handler is to make sure that their hands and feet do not get caught in a bight (bend or loop) in the rope. During trial, Plaintiff's own expert witness, Captain Stoller, testified that the probable mechanism for the accident was that Moore got his leg caught in the bight of the rope. However, Moore argued that there was a "kink" in the line, and that the existence of a "kink" was evidence that the line was improperly maintained.

The jury likely rejected this argument on the basis that the use of the term "kink" by some witnesses was not meant to describe a defect in the line. During the video deposition of Wesley Kelly, Mr. Kelly testified that he had never heard the expression "bight of the rope" to refer to a loop or coil in a rope. To describe a coil or loop in a rope, such as the loop which Moore likely stepped into, Mr. Kelly preferred to use the term "kinks." Mr. Kelly's use of the term "kinks" was clearly not intended as a description of a defect, it was merely the term Kelly preferred to use to describe a loop in a rope. The "kink" issue was actually a mere point of semantic differences. The use by different crew members of a different word to describe a bend or loop in the rope is not evidence of a defect or unreasonably hazardous condition in the line.

The evidence at trial established that the mooring lines aboard the vessel were well cared for and were in excellent condition. The First Mate aboard the vessel, Albert Carter, testified at trial that before the season in which Moore was injured, Mr. Carter had the welders at Omega Protein weld a round bar on the vessel for use in storing the mooring lines off of the deck. The lines were in good working condition, properly cared for and stored off the deck. There was absolutely no evidence at trial that there was a defect in the lines. The "kink in the line" theory was mere argument unsupported by any evidence that there was an actual defect in the equipment aboard the vessel. The jury was not required to accept this argument. The jury reasonably found that the line was reasonably fit for its intended purposes, and that the line was not unsafe or defective.

The jury was also afforded the opportunity to observe Captain Newton, Albert Carter, William Moore, and the other witnesses who testified by video. The jury was able to weigh their statements and evaluate their credibility. Captain Newton and Mr. Carter explained the proper procedure for entering the locks and tying off the vessel. They also described the events on the day of the accident. The jury obviously believed and credited their testimony. The testimony of Captain Newton and Albert Carter was bolstered by the general circumstances of the case. Considering that the evidence, both direct and circumstantial, favored Omega's position, the verdict of the jury was reasonable and should not be disturbed.

## LAW AND ARGUMENT

A. **Standard For Evaluating Motion for New Trial**

Upon the conclusion of a jury trial, Federal Rule of Civil Procedure 59 empowers the trial court, on motion, to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court [.]" Deciding whether to grant a new trial is a matter

"confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980).

A trial court "should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 670 (5th Cir. 2002) (quoting *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir.1998)). Even if substantial evidence supports the jury's verdict, the court may find that the weight of the evidence is against the verdict; however, the court cannot grant a new trial "simply because [the court] would have come to a different conclusion then the jury did." *Peterson v. Wilson*, 141 F.3d 573, 577 (5th Cir. 1998).

Likewise, "[t]he fact that there was conflicting testimony regarding causation and damages is not grounds for a new trial." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992). "Where the jury could have reached a number of different conclusions, all of which would have sufficient support based on the evidence, the jury's findings will be upheld." *Dawson*, 978 F.2d at 208. The court views the evidence "in a light most favorable to the jury's verdict . . . and [the verdict] must be affirmed unless . . . the court believes that reasonable persons could not arrive at a contrary decision." *Dawson*, 978 F.2d at 208, citing *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 986 (5th Cir. 1989).

**B.**     **The Evidence In This Case Was Sufficient To Support The Jury Verdict**

In the present case, the evidence admitted at trial was sufficient for a reasonable jury to reach a verdict in favor of Omega Protein. The verdict was not unsupported or unreasonable.

Moore suggests that a new trial should be granted because he presented more witnesses than Omega on the issue of whether Moore was negligent. The number of witnesses on a given issue has never been the lynchpin of the determination of whether a jury is reasonable in either

accepting or rejecting the testimony of the witnesses. In this case the jury was correctly instructed on this issue as follows:

> The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

(Fifth Circuit Standard Jury Instruction § 3.1 (West 2009)) The fact that Moore may have presented more witnesses on an issue is irrelevant and does not compel the granting of a new trial.

Moore also argues that because he presented a liability expert, and Omega did not, the jury verdict should be disregarded. However, it is well settled that, "a trier of facts need not accept the opinion testimony of expert witnesses, even though uncontradicted." *Boutin v. Newfield Exploration Co.*, 2010 U.S. Dist. LEXIS 137535 (W.D. La. 12/30/2010), quoting *Griffin v. Missouri P.R. Co.*, 413 F.2d 9, 13 (5th Cir. 1969), and *Boon Enterprises, Inc., v. Carstairs*, 312 F.2d 323 (5th Cir. 1963). In evaluating expert testimony, jurors "have a right to use their own common sense and experience and to draw all reasonable inferences from the physical facts and occurrences." *Remington Arms Co. v. Wilkins*, 387 F.2d 48, 54 (5th Cir. 1967). In this case the jury was correctly instructed, regarding the testimony of the expert witness, "you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it." (Fifth Circuit Standard Jury Instruction § 3.1 (West 2009))

The evidence in the record of this case is more than sufficient to support the jury's verdict. All three theories of negligence presented by Moore at trial were reasonably rejected. The jury had ample evidence from which it reasonably rejected Moore's claim. The jury was required to make a decision. In this case, the jury chose to render a verdict in favor of Omega

9

Protein. The verdict was not unreasonable or against the great weight of the evidence. The jury's verdict was appropriate and should not be disturbed.

## CONCLUSION

For the foregoing reasons, Defendants, Omega Protein, Inc. and M/V RACCOON POINT, respectfully request this honorable Court to deny the Motion for New Trial (Doc. 68) filed on behalf of Plaintiff, William Moore.

Respectfully Submitted:

BREAUD & MEYERS

*S/Alan K. Breaud*
_____
ALAN K. BREAUD, T.A. No. 3420
Post Office Box 3448
Lafayette, Louisiana 70502
(337) 266-2200
FAX (337) 266-2204
Attorney for Respondents,
Omega Protein, Inc. and F/V RACCOON POINT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WILLIAM MOORE | CIVIL ACTION |
| VS. | NO. 2:10-cv-00311 |
| OMEGA PROTEIN CORPORATION AND M/V RACCOON POINT | JUDGE ENGELHARDT MAGISTRATE ROBY |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 4, 2011, a copy of the above and foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Messrs. Robert P. Wynne and Michael E. Pierce by operation of the Court's electronic filing system.

*s/Alan K. Breaud*

_____

ALAN K. BREAUD

11