UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

******************************************************************

WILLIAM MOORE

CIVIL DOCKET NO. 10-311 "N"
NEW ORLEANS, LOUISIANA
WEDNESDAY, JANUARY 12, 2011

V.

OMEGA PROTEIN, INC.

******************************************************************

**DAY 3**
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE KURT D. ENGELHARDT
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: ARNOLD ITKIN
BY: ROBERT P. WYNNE, ESQUIRE
5 HOUSTON CENTER
1401 MCKINNEY STREET, SUITE 2550
HOUSTON TX 77010

FOR THE DEFENDANT: BREAUD & MEYERS
BY: ALAN K. BREAUD, ESQUIRE
600 JEFFERSON STREET, SUITE 1101
LAFAYETTE LA 70502

OFFICIAL COURT REPORTER: CATHY PEPPER, CRR, RMR, CCR
CERTIFIED REALTIME REPORTER
500 POYDRAS STREET, ROOM HB406
NEW ORLEANS, LA 70130
(504) 589-7779
Cathy_Pepper@laed.uscourts.gov

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY. TRANSCRIPT PRODUCED BY COMPUTER.

# I N D E X

EXAMINATIONS PAGE

CLOSING ARGUMENTS BY MR. WYNNE........................ 511
CLOSING ARGUMENTS BY MR. BREAUD....................... 518
REBUTTAL CLOSING ARGUMENTS BY MR. WYNNE................ 528
CHARGING THE JURY..................................... 533
JURY DELIBERATES...................................... 551
PROFFER 1............................................. 553
VERDICT............................................... 559

**P-R-O-C-E-E-D-I-N-G-S**

WEDNESDAY, JANUARY 12, 2011

M O R N I N G   S E S S I O N

(COURT CALLED TO ORDER)

01:17PM

09:03AM

09:03AM THE DEPUTY CLERK: All rise.

09:03AM (WHEREUPON, at this point in the proceedings, the jury

09:03AM panel enters the courtroom.)

09:04AM THE COURT: You all may be seated. Thank you again for being here on time promptly and being ready to proceed. As I indicated, we're going to go ahead this morning with the closing arguments, 20 minutes per side. Mr. Wynne, you said you were going to reserve up to eight minutes for rebuttal?

09:04AM MR. WYNNE: Yes, Your Honor.

09:04AM THE COURT: I'm going to be the official timekeeper here. I will give you a one-minute warning at 11 minutes but I will not stop you. If you exceed that time, we'll subtract it from the balance.

09:04AM Then Mr. Breaud, you will have 20 minutes. I will give you a warning at the 19-minute mark.

09:04AM Then Mr. Wynne, I will also give you a one-minute warning on the balance of the rebuttal time. Okay. Counsel, if you would go ahead and take the podium, and we'll begin whenever you're ready.

CLOSING ARGUMENTS

BY MR. WYNNE:

May it please the Court. Good morning, ladies and gentlemen.

THE JURORS: Good morning.

MR. WYNNE: When I was thinking about this case last night and what I was going to say to you, I thought about the whole duration of this case, not the three days that you and I have gotten to talk to each other, but about the past year or so that I have got to know Mr. Moore. And when Mr. Moore first came to my office and first met me, I don't think he had ever met a lawyer in his life. I don't think he had ever been in a law office in his life. And like a lot of guys who work on the boats, onshore and offshore, he was new to the process. And he had to lean on me to help him. So my job as a lawyer is to walk him through, sort of take his hand and shepherd him through this entire process for the past 12 months. And what I have to do today in approximately 40 minutes is I have to take his hand and I have to give it to you. It always makes a lawyer nervous when he does that, because I'm no longer in control of the process. At that point, there is going to be nothing more that I can do for Mr. Moore.

I'm going to have to ask you to put him on one of two courses: The first course is you can put him on a course that takes care of him, that makes him as good as he can possibly

09:06AM be, and puts him in the position he would have been in had he never been hurt. The second course is you can tell him, Mr. Moore, we understand what happened to you, but too bad, too sad. And you can put him on a course that's going to take him for the next 22 years of his life on a downward spiral.

This is Mr. Moore's only opportunity to ever come into court. In three or four years, if things get worse, he can't come back in here, he can't come and talk to another jury. This is it.

One of the things that I talked to you about, the first thing I talked to you about in this case was, Listen to the evidence, not the arguments. Listen to what the witnesses said, listen to what the documents showed. One of the things that I got up here on the first morning and I made you a couple of promises. I told you that safety comes first. I told you that there is a better and safer way to do it. That's the way it should be done. Every witness that you heard from agreed with that. I made you a promise, I backed it up with the evidence.

The second thing I told you was all the fact witnesses in this case were going to agree with what happened. And I want to show you that Exhibit 16, page 1214, the witnesses. Frank Smith and Wes Kelley. Those are the people that Omega said are the ones who know what happened. You heard Captain Newton, you heard him tell you if you're going to listen to anyone in this case, listen to Frank Smith. What did Mr. Smith say? He

said going too fast, no spotter, kinks in the line, Mr. Moore did everything right. He said the captain did everything wrong.

Mr. Wes Kelley said the exact same things. Mr. Moore said the exact same things. The three people with firsthand knowledge of this accident all said the same things. I told you what the evidence was going to be. I made you that promise, I backed up my words.

The third thing I told you was Mr. Moore had a severe injury. I told you he had three surgeries. I told you he had a plate in his ankle with seven screws. I told you there was wires in them. I told you he had nightmares, flashbacks. I told you about the pain he has been having, and I told you that the only medical evidence in this case was going to show that he will have that pain, five out of ten and six out of ten, for the rest his life. That's the promise I made to you. That's the evidence I backed up. I have proved my words to you.

Now, defense counsel got up there and he told you some things too. One of the things he told you was, Mr. Moore stepped into the bitt. What he told you in opening statement was Mr. Moore's own words in the statement that was recorded three days after the accident was going to prove that Mr. Moore stepped in the bitt. Well, you saw that statement, and I'm going to show it to you again. Page 1296. Did Mr. Moore ever say that he stepped into the loop of a rope? No. Did he say he stepped into the bite of a line? No. He said the rope caught him against the

bitt. What defense counsel told you in opening statements he didn't back up. He wrote you a check that he can't cash now.

In fact, not only did Mr. Moore, three days after the accident, say exactly what he's testified today, exactly what he said for the last two and a half years, Frank Smith backed him up, Wes Kelley backed him up, even Albert Carter backed him up. Do you remember when Albert Carter said, Yeah, I talked to Mr. Moore the day of the accident. I talked to him in the hospital. He told me the line caught his leg and pinned him against the bitt. He never said the loop.

In fact, the only person who said that Mr. Moore said anything about stepping into the loop was Captain Newton. But Captain Newton, the accident report doesn't say that. He never changed the accident report. It doesn't make sense, and he would be the person responsible if it happened the way everyone said it happened.

Now, go down that path a little bit further. Did you hear what Captain Newton and Mr. Carter said? Mr. Moore is a hard worker, he's a good worker and he's a safe worker. There is no one, no evidence that said Mr. Moore is unsafe or did anything wrong. The same can't be said for Captain Newton. Do you remember? Listen to Frank Smith. What did Frank Smith say? Unsafe. Speed over safety. Profits over people. Not putting safety first. That's the undisputed evidence in this case.

I backed up everything I told you. Ask defense

counsel whether he can back up the promises he made to you. Ask him to cash that check.

Now, defense counsel also told you that there is no way this accident could have happened the way Mr. Moore said it happened. Well, what witness said that? Who said that from the witness stand? What document backed that up? Nothing. Every witness said that's how the accident happened. It caught him. In fact, if that was so impossible, if that catching the ankle and pinning it against the bitt was so impossible it could never happen, why in that accident report did Captain Newton write that's how it happened? The man who has 40 years experience told you two and a half years ago, the day of the accident, that's how it can happen, and everyone else said that's how it did happen. I told you the evidence, I backed it up.

Now, defense counsel also told you that Omega is a good company. And you know what, maybe Omega is a good company. I really don't know much about it. Maybe they, for years they've worked and do this fishing work and they are good at it and they are safe. But the evidence in this case is they are not a good company. The evidence in this case is they are not a safe company.

Now, I want to talk to you about that. Do good companies send an investigator three days later to the hospital to interview someone when he's under medication? No. And this investigator, did they send him to talk to Wes Kelley? No. Did

they send him to talk to Frank Smith? No. Did they send him to talk to Captain Newton? No. Do they send him to talk to Albert Carter? No. The only person they sent him to talk to was a man who had his leg crushed and was under medication.

Now, good companies. Talking about offering Mr. Moore a job. Did they offer him a job as a cook? Do they offer any type of job? No. The only thing they said is, Come back and work as a fisherman, despite the fact they had all the medical records that said he can never do that. Is that what a good company does? No, a good company makes accommodations for the people that it hurt. Did that happen in this case? No.

Now, they said they paid for their medical bills. Well, they did. They paid for them for about a year. There is a federal law that requires them to do that. If they don't do that, they can come into court and be hit with hundreds of thousands of dollars in penalties. This isn't something they did out of the goodness of their heart. It's something they did because federal law says you have to do it.

But after that year they haven't paid for the rest of his medical bills. They haven't taken care of him.

Now, let's talk about good companies. I want to show you the two accident reports. Do you remember when defense counsel got up and said, Well, we changed the Coast Guard line, the Coast Guard description because of what was in Mr. Moore's statement. There is nothing in Mr. Moore's statement, and you

can look at it. There is nothing that says he stepped into the rope. Do you see that, where it switched from caught foot to stepped into the rope? There is nothing in his statement that backs that up. And remember, that statement wasn't transcribed until four months after this was sent to the Coast Guard. It's not true.

THE COURT: One minute, Mr. Wynne.

MR. WYNNE: Now, you're going to be given a verdict form in this case and it's going to look like this. The first question is, Do you find by the evidence that Omega Protein was negligent? All the evidence said the captain is too fast. No spotter. All the evidence says kinks in the rope. There is no question that when you take the evidence, all I have to do is tip the scale, I didn't just tip it. Everything said they are negligent. You're going to be asked to answer this question. Yes.

The next question is, Do you find that the vessel the RACCOON POINT was unseaworthy? That means, was the condition of the rope reasonably fit for its intended purpose? Mr. Smith said no. Mr. Kelley said no. Mr. Moore said no. Captain Stoller said no. The only person who said yes was Albert Carter. Do you remember they put up that photo of the racks? What did Mr. Carter tell you? Fresh grinding. Fresh welds. That photo was produced three weeks ago. It wasn't produced two and a half years ago. The evidence says yes.

09:17AM When you're asked these two questions, preponderance of the evidence is not just tipping the scale, it's overwhelming that Omega was negligent, their vessel was unseaworthy. Thank you, Your Honor.

09:17AM 09:17AM 09:17AM 09:18AM THE COURT: All right. Thank you. You have about 7 minutes 10 seconds left.

09:18AM 09:18AM CLOSING ARGUMENTS

09:18AM BY MR. BREAUD:

09:18AM Good morning, ladies and gentlemen.

09:18AM THE JURORS: Good morning.

09:18AM MR. BREAUD: On behalf of Omega Protein, I appreciate your attentiveness this week. As the Judge says, y'all were here on time, y'all stayed awake, and I appreciate that, and Omega Protein does, too, because this is the system. This is the system, the legal system that y'all hear about. Y'all hear criticisms about, y'all hear praise about. But this is it.

09:18AM 09:18AM 09:18AM 09:18AM 09:18AM 09:18AM I've been doing it for 30 years. Sometimes I wonder, you know, a lawyer like Mr. Wynne here get up and tell everybody what to say. Start picking clips out of people's testimony, one line out of an hour deposition, that is this a system I want to be involved in? Paying witnesses to come in from California to repeat what, get information that he gives them. And start criticizing men like Captain Newton who has been doing this for 40 years, flew through a snowstorm to come defend himself. I don't know. I just depend on people like yourselves,

09:18AM 09:18AM 09:18AM 09:18AM 09:19AM 09:19AM 09:19AM 09:19AM 09:19AM

most of you from Jefferson Parish, I know what Jefferson Parish people are like, hard working people. I would like for you to bring your hard working experience to court. Because you don't have to check at the door your common sense. You have to listen to the evidence, you have to look at the exhibits. You have to listen to the Judge's instructions, but you make the decision. That's the only thing that's got my client here, is that we can have a jury like yourselves determine whether you're going to believe the information that you were provided by the plaintiff or believe that what Mr. Moore had to say initially, this was an accident and that's all it was.

I didn't get up here in opening statements and say he didn't have a severe injury. I said quite the contrary. I agreed with him. There was no, there is no evidence that said my client did anything but begin paying his medical bills immediately. The evidence indicates that they took care of Mr. Moore, paid him, paid him money when he needed money to be convalescing.

But let's listen to this for a second. There are a couple of things I want to make observations, because you can take the evidence and you can believe what you want to believe from it, or you can put it together yourselves and not depend on the lawyers putting it together for you.

Mr. Moore came out of prison, by the way, I bet he had a lawyer before he went to prison. Even if you can't afford

09:21AM one, you're given one, so the idea he's never had a lawyer before, I'm confused about that. But nevertheless, he came out of prison, he was living in a boardinghouse above a bar, and he came to Captain Newton and asked for a job. Captain Newton gave him that second chance. Maybe that's why he didn't go back to Daybrook, they wouldn't. But Captain Newton gave him the second chance. He worked for just about a month before he had this accident. Now he tells you on the stand that he's got a nice house with a yard with a man cutting his grass. Mr. Moore doesn't sound like he's on a downward spiral to me. It sounds like his life got a little bit better.

09:21AM Mr. Wynne keeps saying that Mr. Moore has a five out of ten pain, whatever that is. Mr. Moore, I watched him, I'm sure y'all did, too. He didn't appear to be in excruciating pain, if any, to me, and he says he's taking Tylenol. So how much of this is exaggeration in order to get your sympathy to give him a bunch of money right now and how much of it is fact? You can make that determination.

09:22AM As you will make the determination as to whether Captain Newton was negligent, failure to do something a reasonable person would do under the circumstances, and that negligence caused his accident. That's your prerogative. You saw the jury verdict form. And we hope that you answer "no" to those questions. We've taken care of Mr. Moore. This shouldn't be the lottery.

This is the first case I think in 30 years I've had where I'm defending where a captain called over a radio to a lady at the plant who wrote something down on an accident report as being sacrosanct. Their number one priority was to get this man to the hospital, called an air ambulance. And now we're defending what Captain Newton said over the radio on a document that there is no evidence that it ever went anywhere other than our files until this lawsuit was filed?

The only document that the evidence indicates was sent to anybody was the Coast Guard report. And that was prepared on August 14th, after, yes, we sent somebody to investigate the accident. If we didn't, that would be another claim they were making. We went to find out what happened from Mr. Moore himself.

Captain Newton, he didn't, he wasn't asked to go to the hospital. He was concerned about his crewmember. He went to the hospital. The man apologized profusely for doing something, in his words, stupid. I didn't call him that. We didn't have to start pointing fingers. So Captain Newton reported from the man himself what he found out, and that's what was put on the accident report and sent in. Nothing else happens, except when the lawsuit starts, they say, Well, you didn't write it just like this. Y'all can read the two accident report descriptions, but you know what, what really is good reading, I would like for you to read Exhibit 26, his statement. Because this came from

Mr. Moore himself. And he says he's on medication. There is no evidence of that. That he was, he was in some mental state that he couldn't answer these questions. In fact, if you listen, if you read the statement, he answers each and every one of these questions quite well.

Again, let's pick a line out, let's pick a line out and try to form it so that we can have you believe one story over the other.

I didn't make this stuff up. I put the red arrow there. How did your feet get involved in that? How did your leg get involved in that? It got wrapped in the rope by the accident. Okay, it got wrapped in the rope? Yeah. What does wrapped in the rope mean? And that's, you know, ladies and gentlemen, that's what I want you to think about when you go back in the jury room. I gave an example of a hose cart because that's something we all use. If you're wrapping a hose cart, the end of the hose where the faucet is is loose. If you pull the hose onto the cart, you're moving the hose, if that hose hits your leg or somebody else's leg, it bounces off. In this case, if you -- this accident cannot, and I ask everybody in, my office people, people, my wife, Mr. Ott, how can a rope going across somebody's leg have this type of injury? Not a bruise, not a cut.

The only way this accident happens is if the rope catches his leg and brings it to the bitt on the boat. He's

standing on the deck. The bitt is two or three feet, by the picture, above the deck. The rope, by everybody's testimony, is laid out down the deck. This is a round rope, and if it's, and Mr. Kelley said it didn't have any kinks until the very end, and he described the kink as a worn area. But you know what, let's even say it has a kink like a hose sometimes kinks. How does that rope grab somebody's leg, bring it up two or three feet against a bitt?

You heard Mr. Kelley, he thought he was going overboard. He had to be laying on this rail to believe he was going overboard. Do you know what happened? His foot got caught in the bite of the rope, the coil of the rope, and it went up against the bitt. And it did put him on the rail. The only way it can happen.

A running hose pipe, a running rope can't grab your leg. Now, y'all are good, hard-working people. If y'all can figure it out any way different, you have my admiration because I have beat myself over, time and time again, trying to figure out if he did not step in the coil of the rope, how in the world this accident can happen.

And why is that important? Because, as he says, as their guy from California says, as everybody says, that is just the number one obligation and duty of a deckhand, handling a rope is to watch your feet, don't step in the rope.

Captain Newton walked out, Catch that post, catch

that post. He said about a minute later, "Man down." What happened as he described it is that Mr. Moore got a jump on things, threw the rope and tried to tie it off the bitt too soon. The boat had not quit drifting. In his statement that's all he says, the boat was drifting. It quits drifting when the captain, he's walking back to his throttle, to back it off, he got ahead of things.

You know, just to answer his question, we talked to Mr. Moore, he tells us four times, and I've marked it in this statement, four different times that it's an accident, it's an accident, it's an accident, I've done this for 25 years, it's a freak thing, it's just an accident. Is it safe? He's saying it. How did you secure, how -- you got -- let me read this better. You got to secure your vessel? Right. And in a safe, safe manner way, that's how you're supposed to secure your vessel. Question, sure, okay. And the accident happened. It was just an accident. That's Mr. Moore talking about how he did it in a safe way and it was just an accident.

By the way, he was saying that the rope was bad. Mr. Sarkies tried to find out exactly what he needed to look into.

Question: "How about the rope? Was it a normal rope?"

Answer: "Normal rope."

Question: "Did the walking surface that you were

on fine?"

Answer: "Everything was fine."

Question: "Okay."

Answer: "No grease or nothing. Everything was in order."

Question: "So you didn't slip or trip?"

Answer: "I didn't slip or nothing. It was just an accident."

So let me guess why does Mr. Sarkies go out and talk to other people? Mr. Moore himself was telling us there was nothing wrong with the rope. There was nothing wrong with the bitt. There was nothing wrong with the walking surface. It was just an accident on his part.

No, we didn't think we were going to get sued and two years later be in court defending this case.

You know, the witnesses that were called, Mr. Kelley, Mr. Smith, they were given these questions by a very skilled lawyer. Isn't it true that the captain is the captain? Yes. Isn't it true this, isn't it true this, isn't it true this? You noticed that Mr. Wynne never asked them to talk? But just to say yes and no to everything? These four guys are deckhands, fishermen, yes. They can be manipulated. It's tough to be a witness when you're not a witness every day.

Now, his witnesses that he called who are witnesses every day, remember the vocational rehab that says that

Mr. Wynne's law firm is their best client, they are in court all the time for them. He says that Mr. Moore could earn up to $22,000 a year. Currently. Has Mr. Moore gone back to work? Absolutely not. Do you know why? If he was working, if he was making $22,000 a year, they wouldn't be able to ask you for so much money.

How much was he making? Well, that depends. When he worked for Omega, he was averaging 14 to $15,000 a year. When he worked for another company, he was averaging around $22,000 a year. $23,000 a year.

But he had 15 years of earnings with Omega and that's what he was averaging, because they get paid on fish catch. Whether his expert who worked at Exxon makes a certain amount of money versus a local oil company, that's the difference in working for Exxon and maybe a local oil company.

But his own expert says, No, they never asked me to find him a job. They never, they asked me to look and see if I could get him back to work in his present situation. Yes, Omega did offer him a job. Come back, we'll get you back to work? Did he? No. You know, this is it. He's right. Let's wait for the jury. If you are working, if you are showing that you could be productive, the jury is not going to have as much sympathy for you. Sit around and do nothing and wait for your day in court so we can say this is your only day in court.

I never give money to the guy on the street

begging, but I always give a lot of money to the maid in the hotel. She's working. I had a guy tell me in Lafayette the other day, Lafayette people are so generous that people quit their job just to beg.

You know, ladies and gentlemen, get to the negligence issue one more time, I was trying to think of what Captain Newton was describing, because in this statement he never suggests that the captain is going too fast or they need a spotter. In fact, the captain and Mr. Carter never even heard that word. That's a lawyer term, spotter. He asked Mr. Kelley, You need a spotter? Yeah, sure. Not something that they use on boats, but I was, I was thinking about this when I wasn't sleeping last night. Those of you who live on the Westbank have taken the ferry probably more than once when the GNO's got backed up or closed. A good example of going into a lock in a boat. The guy on the ferry tells you when you can come and where to park. And you're not racing on that ferry. You're going at the speed that they allow. And once you get on the ferry, you're captive until you get to the other side of the river.

In this case, the captain waits. When he's given the okay, he pulls in, puts his boat where he's told to put it, starboard, port, they don't have any choice. They park where the lockmaster tells them to. And he puts the boat there at, in his term, in a single clutch.

THE COURT: One minute.

MR. BREAUD: He can't speed through a lock. There is no evidence that he was speeding. He didn't hit anything. They didn't run into the lock. Mr. Moore himself said the boat was drifting at the time of his injury.

Ladies and gentlemen, a round rope can't reach up and grab you. It's just impossible. And Omega Protein has done what they could for Mr. Moore. We're sorry he was injured. But there is just no evidence that this injury was caused because Captain Newton was driving his boat in a reckless manner. This man had 25, 30 years experience by his own admission of tying up boats.

THE COURT: Time.

Mr. Wynne, you have the balance of your time.

REBUTTAL CLOSING ARGUMENTS

BY MR. WYNNE:

Thank you, Your Honor. Defense counsel called this man who works as fisherman for 25 years, lifted 150 pounds every day a beggar. A beggar. A man who worked for them for 15 years is a beggar. That's what Omega thinks of this man. Does that sound right?

Let's talk about what he also said. He also said the captain wasn't speeding. The captain said 60 seconds I was coming in before this happened. If he was coming in for 60 seconds, he would have ran into the BULLDOG which was just 15 feet in front of him. It's not true. Just like most of the

09:38AM things Captain Newton said. Not true.

09:38AM Let's talk about how this accident happened. He said it's impossible, right? Kink in the line, a fixed bitt, and a fixed bitt goes from the deck up. He doesn't have to hit it up here. He can hit it right here. Right where his ankle is. Right where it broke. You have a rope like my thumb, a leg like a pencil, and a fixed object like a bitt. And what happens is it breaks. And no matter how much you try, you can't put it back together. It's never the same. That's what happened to Mr. Moore. That's what all the evidence in this case is.

09:39AM Let's talk about that. Talk about his wages. The evidence in this case, when you add up these wages, and that's the only evidence in this case. The only evidence in this case is that Mr. Moore suffered a loss of wages. And how much? In the past, all the evidence is when you add it up, undisputed, $55,263. That's all the evidence. Nothing refutes that. Did you hear anyone from their side come up and say that's not true? All you heard is their lawyer say it's not true.

09:40AM Let's talk about the future expenses. The future wage losses. Trying to put this pencil back together. You heard those numbers too. There is two options: Best case and worst case. You're going to get a thousand pages of medical bills. Or medical records. Not a single page, and take your time and look through them. I've looked through them all. Nothing says this man can return to work. Nothing.

Did you hear the doctor? He didn't say he was exaggerating. He said the man was honest with him the whole time. No one in this case says this man is an exaggerator. No one in this case says this man is lying. No one in this case says this man is magnifying his symptoms except the lawyer.

When you add up those wages, the money he's going to lose from making 27 to $30,000 a year, the only evidence in this case that totals $279,526.

Now, if you want to put him back to work and you think you can do that, you can, the amount of money in that is 174,526. I tell you you can apply the evidence, all the evidence says he can't go back to work. I wish he could. But let's say in three years he still can't. He can't come back in here and ask for it. Past medical expenses. You're going see an exhibit. It's Exhibit 1. Excuse me.

MR. BREAUD: Excuse me, Your Honor, this was not discussed in my closing.

MR. WYNNE: Exhibit 2. You're going see --

THE COURT: No, overruled. Go ahead.

MR. WYNNE: The past medical bills in this case, this will be Exhibit 2 and Exhibit 3, once again, undisputed. Past medical expenses, $1,088. You heard about 22 more years of this man's life. You heard Dr. Granger. So for the next 22 years he's going to need similar treatment. Take 22 times what he had in the last year, future medical expenses are $22,000.

Next thing you heard is past pain, suffering, future pain and suffering, mental anguish, physical impairment. Those are all separate elements of damages. We've combined them all here for your convenience, and I want to talk about that.

Let's talk about the past pain and suffering. Physical pain and suffering.

MR. BREAUD: Same objection, Your Honor.

THE COURT: I'm sorry. Now, we talked about his injury, but we didn't talk about any of this on closing arguments. So this is limited to rebuttal. So I'm going to ask you to skip ahead.

MR. WYNNE: Can I talk about filling in?

THE COURT: You should have covered that on your first.

MR. WYNNE: I believe he called him a beggar and said he's not hurt, Your Honor.

THE COURT: Yes, but this doesn't relate to that. Mr. Breaud argued about his injury itself.

MR. WYNNE: The evidence in this case is this man's injury for the next 22 years, will be five out of six -- five out of ten, six out of ten. Now, 22 years, that ends up being 8,140 days. For 8,140 days this man is going to have pain. For 8,140 days this man is going to walk with a limp.

MR. BREAUD: Objection. Unit of time argument, Your Honor.

THE COURT: One second.

MR. BREAUD: He's a making a unit of time argument.

THE COURT: This is limited to rebuttal of what Mr. Breaud said. And I think we're going afield from that. You talked about the injury itself, how it happened, type of injury, but we are really getting far afield from what Mr. Breaud said. So let's go ahead and wrap it up.

MR. WYNNE: All the evidence in this case is going to be that this man is not a faker, he's not a beggar. All the evidence in this case is this is severe. All the evidence in this case is going to back up everything he said. There is going to be nothing as far as liability, their negligence or the amount of his damages that's in dispute. What you're going to be asked to do is make a determination as to what that's worth. What the last two and a half years of his life has been worth. The scars, the pain, the suffering, what the next 22 years is going to be worth.

I can't tell you what to put down there, and there is no mathematical calculation similar to the medical bills which you just add up and similar to the wages which you add up. That's up to you.

But I've been in cases like this, and I've seen cases like this. And when you look at the evidence, I would ask that you award right here $750,000.

MR. BREAUD: Excuse me, Your Honor.

THE COURT: Wait. Look, rebuttal is limited to rebuttal

of what opposing counsel says. This is all stuff that you could have done as part of your primary closing argument. And you're taking advantage of rebuttal to cover things that were not covered on the defense's closing argument. And, if I've got to give Mr. Breaud more time, then you're not going to want me to let him exceed his 20 minutes. He took his 20 minutes, and your rebuttal time is limited to rebuttal. If you wanted to cover all of this, you could have taken less time and gone into it in order for him to respond to it.

MR. WYNNE: Yes, Your Honor.

THE COURT: So let's move on.

MR. WYNNE: Now, counsel said don't listen to Mr. Quintanilla, the vocational rehabilitation expert. Where was their vocational rehabilitation expert? Once again, not the evidence, it's the argument.

THE COURT: In fact, your time has expired, as a matter of fact.

MR. WYNNE: Thank you.

THE COURT: All right. Ladies and gentlemen of the jury, I'm going to go ahead and cover with you -- does anybody need to stand up or stretch at this point? If you have to, go ahead and do that. And while you're doing that, what I'm going to cover with you now are the instructions to jury, what we call *charging the jury*. I want you to listen carefully to what I tell you now. I have a set of written instructions which I am going

to cover with you, rather than give these to you now and have you follow along on paper. I'd rather you listen to them carefully now, you will be given the written copy when you go to deliberate, in case you want to go back through anything that I have told you now, you'll have an opportunity, as a group, to go back and review to the extent that you want to.

Members of the Jury, you have heard the evidence in this case. I'll now instruct you on the law that you must apply. In any jury trial, there are, in effect, two judges. I am one of the judges. The other is you, the jury. It is my duty to preside over the trial and to determine what testimony and other evidence is admissible under the law for your consideration.

It is also my duty at the end of the trial to instruct you on the law applicable to the case. It is your duty to follow the law as I shall state it to you. You must apply that law to the facts as you find them from the evidence in this case. You are not to single out one instruction alone as stating the law but must consider the instructions as a whole.

Do not let bias, prejudice or sympathy play any part in your deliberations. That was the promise you made and the oath you took before being accepted by the parties as jurors in this case. And they have a right to expect nothing less.

This case should be considered and decided by you as an action between persons of equal standing in the community of equal worth and holding the same or similar stations in life.

A corporation or political entity has the same right to a fair trial as does a private individual. All persons, corporations, political subdivisions or other entities stand equal before the law and must be treated as equals in a court of justice.

As I stated earlier, it is your duty to determine the facts, and in so doing, you must consider only the evidence I have admitted in the case. The term *evidence* includes the exhibits admitted in the record and the sworn testimony of the witnesses.

Remember that any statements, objections or arguments made by the lawyers are not evidence. Nor are they instructions on the law. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case. And in so doing, to call your attention to certain facts or inferences. Thus, the lawyers' statements and arguments are intended only to assist you in understanding the evidence and the parties' contention.

In the final analysis, however, it is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding on you.

During the course of the trial, I may have occasionally made comments to the lawyers or admonished a witness concerning the manner in which he should respond to the questions of counsel. Do not assume from anything I may have said that I have any opinion as to the facts. Except for my instructions to

you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts. After all, you alone are the judges of the facts.

In a civil action, the plaintiff, who here is William Moore, has the burden of proving every essential element of his claim by a *preponderance of the evidence*. In other words, the plaintiff must prove that every essential element is more likely true than not true. In determining whether a fact has been proven by a preponderance of the evidence, you may consider the testimony of all the witnesses, regardless of who may have called them, and all the exhibits received in evidence, regardless of who may have produced them.

If the proof should fail to establish any essential element of the plaintiff's claim by a preponderance of the evidence, you should find for the defendant as to that claim. While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in light of common experience. In other words, you may make deductions and reach conclusions based on reason and common sense.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if, after considering all the other evidence, you believe that single witness.

There are two types of evidence you may consider:

One is *direct evidence*, such as the testimony of an eyewitness. The other is *indirect or circumstantial evidence*, the proof of circumstances that tend to prove or disprove the existence or nonexistence of certain other facts. The law makes no distinction between direct and circumstantial evidence but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

If a witness is shown to have testified falsely concerning any material matter, you have a right to distrust such witness' testimony on other matters and you may distrust all of the testimony of that witness. You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth.

So if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory. And the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

When knowledge of technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field, he is called an *expert witness*, is permitted to state his opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether to rely upon it. In deciding whether to accept or rely upon the

opinion of an expert witness, you may consider any bias of the witness including any bias you may infer from evidence that the expert witness has been or will be paid for reviewing the case and testifying or from evidence that he testifies regularly as an expert witness and his income from such testimony represents a significant portion of his income.

During this trial, testimony was presented to you through a deposition, or through depositions. A *deposition* is the sworn recorded answers to questions asked a witness in advance of a trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, that witness' testimony may be presented, under oath, in the form of a deposition. Thus, some time before this trial, attorneys representing the parties in this case questioned the witness under oath. A court reporter was present and recorded the testimony. The questions and answers were read or shown to you during the course of this trial. This deposition testimony is entitled to the same consideration, is to be judged by you as to credibility and is to be weighed and otherwise considered by you in this same way, insofar as that is possible, as if the witness had been present in court and had testified from the witness stand.

During the course of trial you will have heard objections to evidence. Sometimes these have been argued out of the hearing of the jury. It is the duty of the attorney on each

side of a case to object when the other side offers testimony or other evidence which the attorney believes is not properly admissible. You should not draw any inference against or show any prejudice against a lawyer or his client because of the making of an objection. Upon allowing testimony or other evidence to be introduced over the objections of an attorney, the Court does not, unless expressly stated, indicate any opinion as to the weight or effect of such evidence.

As stated before, you, the jury, are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.

When the Court has sustained an objection to a question addressed to a witness, the jury must disregard the question entirely and may draw no inference from the wording of it or speculate as to what the witness would have said if permitted to answer.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

As you already have been told, the plaintiff,

William Moore and the defendants in this case, who are Omega Protein, Incorporated, and the fishing vessel RACCOON POINT, have stipulated that: One, William Moore was employed as a fisherman for defendant Omega Protein, Inc.

Two, on August 8, 2008, Mr. Moore was assigned to the F/V RACCOON POINT.

Three, on that date, the F/V RACCOON POINT was owned and operated by the defendant.

Four, Mr. Moore was injured aboard the F/V RACCOON POINT on August 8, 2008.

Five, Mr. Moore has brought this lawsuit under a federal law entitled the Jones Act and under the General Maritime Law. The parties have agreed that Mr. Moore is a seaman as understood in the Jones Act context and that the defendant was Mr. Moore's Jones Act employer.

Stipulations such as these reflect an agreement by the parties as to something being a fact. Thus, they are to be accepted by you as being true. In this lawsuit, the plaintiff, William Moore, is seeking monetary damages from the defendant Omega Protein, Incorporated, for injuries that he allegedly suffered aboard the F/V RACCOON POINT.

Specifically, the plaintiff is asserting two separate claims under federal law against the defendants in this case. The plaintiff's first claim under a federal law known as the Jones Act is that his employer, Omega Protein, was negligent

and that its negligence was a cause of his alleged injuries.

The plaintiff's second claim is that unseaworthiness of the vessel, the F/V RACCOON POINT, caused his injuries.

You must consider each of these claims separately. The plaintiff is not required to prove both of these claims. Rather, he may recover if he proves either one of them. However, he may only recover those damages or benefits that the law provides for the particular claim or claims that he proves. Also, the plaintiff may not recover the same damages or benefits more than once.

With regard to the Jones Act claim, under the Jones Act, the plaintiff, Mr. Moore must prove that the defendant, Omega Protein, his employer, was negligent. *Negligence* is the doing of an act that a reasonably prudent person would not do or the failure to do something that a reasonably prudent person would do under the same or similar circumstances.

The occurrence of an accident standing alone does not mean anyone's negligence caused the accident. In a Jones Act claim, the word *negligence* is given a liberal interpretation. It includes any breach of duty that an employer owes to his employees who are seamen, including the duty of providing for the safety of the crew.

Under the Jones Act, if the employer's negligent

act caused the plaintiff's injury in whole or in part, then you must find that the employer is liable under the Jones Act. Negligence under the Jones Act may consist of a failure to comply with a duty required by law. Employers of seamen have a duty to provide their employees with a reasonably safe place to work. If you find that the plaintiff was injured because the defendant failed to furnish him with a reasonably safe place to work, and that the plaintiff's working conditions could have been made safe through the exercise of reasonable care, then you must find that the defendant was negligent.

The fact the defendant conducted its operations in a manner similar to that of other companies is not conclusive as to whether the defendant was negligent or not. You must determine if the operation in question was reasonably safe under the circumstances. The fact that a certain practice has been continued for a long period of time does not necessarily mean that it is reasonably safe under all circumstances.

A long-accepted practice may be an unsafe practice; however, a practice is not necessarily unsafe or unreasonable merely because it injures someone.

A seaman's employer is legally responsible for the negligence of one of his employees while that employee is acting within the course and scope of his employment.

If you find from a preponderance of the evidence that the defendant assigned the plaintiff to perform a task that

the plaintiff was not adequately trained to perform, you must find that the defendant was negligent.

As to unseaworthiness, as I said before, the plaintiff's second claim for monetary damages rests on his assertion that unseaworthiness of the vessel, the F/V RACCOON POINT caused his alleged injuries. Under federal law, a shipowner owes to every member of the crew employed on its vessel the absolute duty to keep and maintain the ship and all decks and passageways, appliances, gear, tools, parts and equipment of the vessel in a seaworthy condition at all times. A seaworthy vessel is one that is reasonably fit for its intended use. The duty to provide a seaworthy vessel is absolute because the owner may not delegate that duty to anyone. Liability for an unseaworthy condition does not in any way depend upon negligence or fault or blame.

If an owner does not provide a seaworthy vessel, a vessel that is reasonably fit for its intended use, no amount of care or prudence excuses the owner. The duty to provide a seaworthy vessel includes a duty to supply an adequate and competent crew. A vessel may be unseaworthy, even though it has a numerically adequate crew if too few persons are assigned to a given task.

However, the owner of a vessel is not required to furnish an accident-free ship. He need only furnish a vessel and its appurtenances that are reasonably fit for their intended use

and a crew that is reasonably adequate for their assigned tasks. The shipowner is not required to provide the best appliances and equipment or the finest of crews on his vessel. He is only required to provide gear that is reasonably proper and suitable for its intended use and a crew that is reasonably adequate.

In summary, if you find that the owner of the vessel did not provide an adequate crew of sufficient manpower to perform the tasks required or if you find that the vessel was, in any manner, unfit in accordance with the law as I have just explained it to you, and that either was a proximate cause of the injury, a term that I will explain to you in a second, then you may find that the vessel was unseaworthy and the shipowner liable, without considering any negligence on the part of the defendant, Omega Protein or any of its employees.

However, if you find that the owner had a capable crew and appliances and gear that were safe and suitable for their intended use, then the vessel was not unseaworthy and the defendant is not liable to the plaintiff on the claim of unseaworthiness.

Not every injury that follows an accident necessarily results from that accident. Rather, the accident must be the cause of the injury. In determining causation, different rules apply to Jones Act claims and to unseaworthiness claims. Under the Jones Act, an injury or damage is considered cause by an act or failure to act if the act or omission brought

about or actually caused the injury or damage in whole or in part.

In an unseaworthiness claim, the plaintiff must show not merely that the unseaworthy condition was the cause of the injury, but that the unseaworthy condition was a *proximate cause* of it. This means that the plaintiff must show that the condition in question played a substantial part or was a substantial factor in bringing about or actually causing his injury and that the injury was either a direct result or a reasonably probable consequence of the condition.

If you find that the defendants are liable, you must award the amount you find by a preponderance of the evidence as full and just compensation for all of the damages suffered by the plaintiff.

Compensatory damages are not allowed as a punishment against a party. Further, such damages cannot be based on speculation, for it is only actual damages, what the law calls *compensatory damages* that are recoverable. However, compensatory damages are not restricted to actual loss of time or money. They include both the mental and physical aspects of injury, tangible and intangible. They are an attempt to make the plaintiff whole or to restore him to the position that he would have been in if the accident had not happened.

You should consider the following elements of compensatory damages to the extent you find that the plaintiff

has established such damages by a preponderance of the evidence: Physical pain and suffering, including physical disability, impairment and inconvenience, and the effect of the plaintiff's injuries and inconvenience on the normal pursuits and pleasures of life in the past and in the future; mental anguish and feelings of economic insecurity caused by disability in the past and in the future; income lost in the past; impairment of income and ability to earn an income in the future, including impairment of the normal progress in the plaintiff's earning capacity due to his physical condition; past medical expenses and the reasonable value, not exceeding actual cost to the plaintiff, of medical care that you find from the evidence will be reasonably certain to be required in the future as a proximate result of the injury in question.

That medical care may include the reasonable value of hospitalization and medical and/or nursing care and treatment that the plaintiff will require because of his injuries that were caused by the defendant's allegedly wrongful conduct.

You may award damages for any bodily injury that the plaintiff sustained and any pain and suffering, disability, disfigurement, mental anguish and/or loss of capacity for enjoyment of life that the plaintiff experienced in the past or will experience in the future as a result of the bodily injury.

No evidence of the value of intangible things, such as mental or physical pain and suffering, has been or need be

introduced.

You are not trying to determine value but an amount that will fairly compensate the plaintiff for the damages he has suffered. There is no exact standard for fixing the compensation to be award for these elements of damage. Any award that you make should fairly compensate the plaintiff for his injuries in light of the evidence presented.

Any award you make to the plaintiff is not subject to income tax. Neither the state nor the federal government will tax it. Therefore, you should determine the amount that plaintiff is entitled to receive without considering the effect of taxes upon them.

It is your sworn duty as jurors to discuss the case with each other in an effort to reach agreement if you can do so. Each of you must decide the case for yourself but only after full consideration of the evidence with the other members of the jury. While you are discussing the case, do not hesitate to re-examine your own opinion and change your mind if you become convinced that you are wrong. However, do not give up your honest beliefs solely because the others think differently or merely to finish the case.

I have prepared a special verdict form for your convenience and to aid you in reaching a unanimous decision. You will take the form with you into the jury room. The verdict must represent the considered judgment of each juror. Your verdict

must be unanimous on each and every question on that form that you are called upon to decide. Answer each question from the facts as you find them. Do not merely decide who you think should win and then answer the questions accordingly.

I'm going to read through the verdict form with you. It's entitled, United States District Court Eastern District of Louisiana, William Moore versus Omega Protein Corporation and M/V RACCOON POINT, Civil Action Number 2:10-cv-00311. It has my name on it and the assigned magistrate judge's name on it. It's entitled Jury Verdict Form. Read all instructions carefully. You must follow all instructions. The responses to these questions must be unanimous.

Jones Act negligence and unseaworthiness. One, do you find by a preponderance of the evidence that defendant Omega Protein, Incorporated, was negligent in the manner claimed by plaintiff, Mr. Moore, and if so, that its negligence caused in whole or in part Mr. Moore's August 8, 2008, injury? And there is a blank where you will answer yes or no.

Proceed to question two. Two, do you find by a preponderance of the evidence that the F/V RACCOON POINT was unseaworthy in the manner claimed by plaintiff, Mr. Moore, and that its unseaworthiness was a proximate cause as that term is defined in the instructions to the jury of Mr. Moore's August 8, 2008, injury? And there is a blank for a yes or a no.

If you answered "yes" to questions one or two,

proceed to question three.

If you answered "no" to questions one and two, then skip question three, date and sign this form, and inform the court security officer that you are ready to return to the courtroom.

Question three, what monetary amounts will adequately and fairly compensate plaintiff, Mr. Moore, for any damages suffered by him as a result of the August 8, 2008, accident and injury? A, loss of past earnings, including fringe benefits calculated through today. And there is a blank with a dollar sign. B, loss of future earnings, including any diminished earning capacity and fringe benefits. And there is dollar sign with a blank. C, past medical expenses, calculated through today. And there is a dollar sign with a blank. D, future medical expenses, and a dollar sign and a blank. E, present, past and future physical pain and suffering, including physical disability, disfigurement, impairment and inconvenience and the effect of the plaintiff's injuries and inconvenience on the normal pursuits and pleasures of life, as well as present, past and future mental anguish or suffering and feelings of economic insecurity caused by disability. And there is a dollar sign with a blank behind it.

Date and sign this form and inform the court security officer that you are ready to return to the courtroom. There is a blank for the date and a signature line for the

foreperson of the jury.

When you retire to the jury room to deliberate your verdict, you may take these instructions and the exhibits that the Court has admitted into evidence with you. Then select your foreperson and begin your deliberations.

During those deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media such as a telephone, cell phone, smart phone, iPhone, Blackberry or computer, any Internet service or any text or instant messaging service or any Internet chat room, blog or website, such as Facebook, Myspace, LinkedIn, YouTube or Twitter to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.

If you recess during your deliberations, follow all of the instructions that the Court has given you about your conduct during the trial.

After you have reached your unanimous verdict, your foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged unless otherwise directed by me. You must never disclose to anyone, not even to me, any numerical division on any question. If you need to communicate with me during your deliberations, the foreperson should represent a written message or question and give it to the court security officer or deputy

10:12AM marshal who will bring it to me. I will either reply in writing or bring you back into court to respond to your message. I will always first disclose to the attorneys and the parties your message and my response before I answer your question.

10:12AM And I think we have a form that we're going to give you. In case you do have a question, you can write on that form.

10:12AM After you have reached a verdict, you're not required to talk with anyone about this case unless the Court orders otherwise, which would be rare.

10:12AM You may now retire to the jury room to conduct your deliberations.

10:12AM THE COURT SECURITY OFFICER: All rise.

10:12AM (WHEREUPON, at this point in the proceedings, the jury panel leaves the courtroom for deliberations.)

10:13AM THE COURT: Counsel, if you all would be seated. The courtroom deputy advises that you all have signed a certification with regard to the exhibits to be sent into the jury room, so we're going to go ahead and send those in along with the verdict form, which the courtroom deputy has, and a clean copy of the instructions.

10:13AM The only part of the instructions that I did the best I could with it, although I read it as written with the exception of the income question, which we did discuss at the bench during the trial. I think I made one oral change. Just a second here. Yes, it says impairment of earning capacity or

10:14AM ability in the future. And to be honest with you, I know I changed it when I read it to reflect our conversation at the bench regarding earning capacity versus loss of income. Do you recall we had that conversation?

10:14AM MR. BREAUD: Yes, sir.

10:14AM MR. WYNNE: (Nods head affirmatively.)

10:14AM THE COURT: I think I stated it properly, and then below that, this is on page 16, below that there is another, which I did read through as written, plaintiff's earning capacity due to his physical condition. But I did make the correction three lines up from the bottom. I just don't recall the words I used for it. Where it says "impairment of earning capacity," I think it should say "loss of income." I can go back and check the transcript and see if we need to modify that. Does anybody feel strongly about me make that change? I know plaintiff doesn't because it was an issue that Mr. Breaud raised and I think I agreed with him during the trial. And it was the testimony that was presented by the expert, which I think reflected loss of income, not loss of earning capacity. So I don't know whether it amounts to too much in the grand scheme of things since that's what the testimony was. Mr. Breaud.

10:15AM MR. BREAUD: I have no request of the Court to amend that point.

10:15AM THE COURT: Okay, we'll just leave it as is. I think I stated it more correctly, but I don't think this is incorrect in

light of the testimony that was adduced. That's the evidence that they have if they choose to make such an award.

With regard to the jury instructions and the jury verdict form, Mr. Breaud, I know you indicated that you wanted to make an objection. Let me start, we'll get yours. Mr. Wynne, have you any objections on behalf of the plaintiff to either the instructions or the verdict form?

MR. WYNNE: No objection, Your Honor.

THE COURT: Mr. Breaud, do you want to go ahead and make your record? And I think you also indicated a proffer, if I understood.

MR. BREAUD: Yes, Your Honor. And the reason why we, I wanted to do it before the closing argument is that I believe Rule 51 requires me to do it before the closing argument. But to the extent of our lengthy discussion yesterday afternoon at the close of evidence that would be immediately before the closing argument, but also in strict compliance with Rule 51, I didn't want to be short of tendering to the Court the exact language that I wanted to include, which was the pattern jury instruction 4.7 of contributory negligence, which my copy of the pattern jury instruction is the 2006 version, and I would like to proffer that in connection with our, my arguments yesterday afternoon, as well as the Court's, the complete Court jury instructions and jury verdict form we had prepared to incorporate that instruction in that part of the jury verdict form as Proffer 1.

THE COURT: We'll go ahead and accept that as a proffer into the record. I will note, and again, we're not going to go back through the discussion that we had on the record yesterday, but those had not been offered to the Court in connection with submission of jury instructions. Nor were they part of the joint submission which, I think, came from Mr. Breaud in December of the jury instructions that had been agreed to and which were based on the prior trial in November that both counsel were involved in.

So this is the first time that those have been submitted in writing and cited to as the pattern instructions. I might also add that, and I don't think I said this yesterday, that the issue of the jury verdict form and an additional question regarding contributory fault was something that I raised during the midmorning break yesterday, that it had not been raised as an issue by counsel or as even a topic of discussion at any point pretrial or during the trial until I raised it here at the bench during the midmorning break yesterday. And yesterday I described the instructions Monday evening to review, conduct a final review of the instructions and the verdict form, and at 8:30, hearing no objection to those documents as prepared by counsel, and agreed to by counsel, I canceled the jury charge conference that we otherwise would have held had there been some dispute or disagreement as to the jury instructions. So by 8:30 yesterday, everything had been agreed to and it was at a

midmorning conference when I asked about the jury verdict form, at which time Mr. Breaud indicated that, Oh, no, if it didn't include a contributory fault question that it should, and then later in the day we had the discussion which you cited to about the instruction itself. And I heard that yesterday and I ruled on it yesterday. Those were some additional facts that I don't think I covered yesterday on the record.

But we'll accept the proffer in the record and note your objection.

MR. BREAUD: And will the Court acknowledge that I did request to do this before the closing arguments?

THE COURT: I instructed counsel that we would hear objections to the jury charges and the verdict form following me charging the jury with knowledge that we would discuss any such objections either at the charge conference, or in this case, if counsel could agree on the instructions and the verdict form, which they did at one point, up until yesterday midmorning, so I don't think there is an issue with regard to the timeliness of your request.

MR. BREAUD: Thank you.

THE COURT: It was raised for the first time after I asked on Monday evening for a final review and after the 8:30 a.m. time on Tuesday morning -- I hope that's not the jury deliberating. After the 8:30 time period or deadline for telling me of any problems with the drafted instructions and verdict

10:21AM form. But you did raise it. Actually, I raised it midmorning, but you pursued it and adopted it as your position prior to me charging the jury this morning. And I think the record is clear on that.

10:21AM MR. BREAUD: And before closing.

10:21AM THE COURT: Right.

10:21AM MR. BREAUD: Thank you.

10:21AM THE COURT: All right. Is there anything else that we need to put on the record?

10:21AM MR. WYNNE: Do I need to offer any response to that, Your Honor?

10:21AM THE COURT: If you would like to, but I've ruled on the objection. I think he's making his record at this point. If you would like to respond further than what you said yesterday, you may do so.

10:21AM MR. WYNNE: All I would say is the Court's ruling is in accordance with Rule 51 of the Federal Rules of Civil Procedure, 51(a)(1) and (b) and 51(d)(1)(B). The Court is well within its discretion in following the law.

10:21AM THE COURT: Let me also point out, and I don't mean to be, this is not intended to be a criticism of either counsel, but this is the first time I've had counsel agree pretrial to a jury instruction and a verdict form which is, in fact, you all came up with that idea since you had just tried a case in early December here that was quite similar that you all had agreed that you

10:22AM would confer based on the Court's handling of that case and that you would submit, if you could, joint agreed-upon instructions and agreed-upon verdict form, which is what I received via e-mail from Mr. Breaud, I believe, on December 17th. And to your credit, you were able to accomplish an agreement, and I guess on the flip side, yet we're still talking about now about something that was omitted or excluded that was discovered later. But at any point, we did not have the charge conference that I typically would have in my conference room based on the representation that it was all agreed to and that the next deadline I set, which was 8:30 yesterday morning, prior to which I received no objection or no expression of concern.

10:23AM So I know we tried to work hard on this to get this the way we wanted it and we did have an agreement as to it, and like I said, I raised it at the midmorning break. But at any rate, I think the record is clear, and I note Mr. Breaud's position. I think the record is clear, hopefully, as to the chronology of why the instructions are the way they are and the verdict form is the way it is. Does anybody have anything else to put on the record at this time?

10:23AM MR. WYNNE: No, Your Honor.

10:23AM MR. BREAUD: No, Your Honor.

10:23AM THE COURT: All right. Please do not stray far from this area, or if you do, make sure we know how to get in touch with you in case the jury has a question or in case they return a

10:23AM verdict. If we don't hear from them within the next hour, we
10:23AM will send in a menu for them to order lunch so they can
10:24AM deliberate through the lunch hour. We will get back with you as
10:24AM soon as we hear something.

10:25AM THE DEPUTY CLERK: All rise.

10:25AM (WHEREUPON, at this point in the proceedings, a recess was taken while the jury deliberates.)

* * *

**P-R-O-C-E-E-D-I-N-G-S**

WEDNESDAY, JANUARY 12, 2011

A F T E R N O O N   S E S S I O N

(COURT CALLED TO ORDER)

01:17PM

01:17PM

12:03PM THE DEPUTY CLERK: All rise.

12:03PM THE COURT: You can bring the jury out now.

12:03PM (WHEREUPON, at this point in the proceedings, the jury panel enters the courtroom.)

12:03PM THE COURT: You may be seated. Ladies and gentlemen of the jury, I understand that you have reached a verdict in this case; is that correct?

12:03PM THE FOREPERSON: Yes.

12:03PM THE COURT: Mr. Ibarra, you are the foreman of the jury?

12:03PM THE FOREPERSON: Yes.

12:03PM THE COURT: If you would, go ahead and hand that envelope to Pam, the courtroom deputy.

12:04PM VERDICT

12:04PM THE COURT: Okay. I will go ahead and read through the jury verdict form. Question number 1, Do you find by a preponderance of the evidence that the defendant, Omega Protein, Incorporated, was negligent in the manner claimed by plaintiff, Mr. Moore, and if so, that its negligence caused in whole or in part Mr. Moore's August 8, 2008, injury? No.

Two, do you find by a preponderance of the evidence that the F/V RACCOON POINT was unseaworthy in the manner claimed by plaintiff, Mr. Moore, and that its unseaworthiness was a proximate cause as that term is defined in the Court's instruction to the jury of Mr. Moore's August 8, 2008, injury? No.

It's signed by the foreperson, dated January 12, 2011.

Counsel, would anyone like to poll the jury?

MR. WYNNE: No, Your Honor.

MR. BREAUD: No, Your Honor.

THE COURT: The Court will let the jury's verdict be the judgment of the Court.

Let me -- before we release you all from your jury service, I want to cover a few things with you. First and foremost, I want to thank you again. We've thanked you a few times. Thank you again for your patience, your interest and your attention over the last two and a half days. I know when you all got here on Monday morning, you probably, as I said Monday, you probably were hoping you would not get picked to sit on any jury when you reported. Then when you got picked, you probably were wondering, what is this all about, how am I going to do this, is this going to be very difficult? But you did exactly what we expect jurors to do, which is to simply sit and listen to what the attorneys say and listen to what the Court says and try to

understand the evidence and then deliberate on it and come back with answers to the questions that we've asked. So you've discharged your responsibilities quite well.

The other thing is, as I mentioned to the group on Monday morning, sitting for jury service or reporting for jury duty is really one of your most important civic responsibilities, civic obligations aside from maybe your right to vote. Sitting on a jury is really, as a citizen, one of the most important things you can do, because when you look at the way other systems of justice, if you want to call them that, in other countries work, people oftentimes don't get juries. In fact, it's rare across the face of the globe that people resolve disputes by having a jury. You all didn't know each other before Monday morning, you didn't know me, you didn't know anything about this case or the people involved in it or any of the witnesses. And to come in and let the attorneys for both sides expose you to facts and let you decide something is really a great thing.

I want you to think about that in the days and weeks and months to come when you hear about violence in countries and people that don't have an opportunity to do this. You'll really marvel at how important it is to have a jury system to resolve disputes, both criminally and civilly. That's what we try to do here in this building and across the country is to present disputes or accusations of crimes and submit them to folks like yourselves to come in and decide whether someone is

guilty of a crime or whether someone has committed an act of negligence and what type of damages they should recover.

So it's very, very important. It's one of the features of our justice system that I think is perhaps the most admirable is that we do submit disputes to juries as opposed to having some bureaucrat far away decide what's going to happen and make a decision that's not based on evidence.

To have a jury decide something I think is so fundamental in our society that I don't want you to underestimate the fact that you were with us here for two and a half days when you could have been doing something else. We know that it never comes at a convenient time. Some of you have been away from your job for the last two and a half days, maybe away from family or whatever you would normally be doing, so we know that it never comes at a convenient time. But it's just so, so important that you participate. I thank you all very much for your interest and your being prompt every day and really doing the hard work of deciding a case such as this.

The other thing that I want to also do is to thank the attorneys in this case for their work on behalf of their clients. I know these two gentlemen have worked together before in other matters. I'm familiar with them from their practice here in this court, and this case, as in all the others that they've worked on that I'm familiar with, they've done a real yeoman's job of putting this case together. This trial would

have lasted a lot longer but for the fact that these lawyers were prepared, they did everything pretrial that they were supposed to do, and they were able to come in and put together for you a streamlined presentation. It's a lot harder on me and I know it's a lot harder on a jury when somebody is at the podium thinking up questions to ask for the very first time and it becomes apparent that they have not prepared. These two gentlemen who tried this case, along with their staffs, have really put in the effort to try to make a presentation to you that is very comprehensive and at the same time very concise so that we're not here for five days or a week and a half; rather, we're here for two and a half days, and I commend them for their efforts and their conduct during the course of the trial.

Another item that I need to cover with you before we let you go is, I said several times during the trial, don't discuss the case with anybody, including your spouse or amongst each other. Of course, now you are free to discuss the case with whomever you choose, with one limitation: You are not to discuss anything that happened in the jury room. If you took a vote, if somebody took a position, please don't discuss what you all talked about in the jury room. Your verdict represents your discussions.

Okay. Again, one of the great things about the jury system is that you can go into the jury room, I don't know if you noticed, but that room is soundproofed so that you can

have a very honest and candid discussion amongst yourselves without fear of somebody coming out of the jury room and saying, Well, I thought this, and he thought that, and then this one said this. That's the purpose of the jury room, for you all to air whatever positions you had. I don't know to what extent there was any disagreement whatsoever or any discussion, but always for jury service, we ask that you please keep to yourself what you talked about in the jury room other than the fact that you have these questions answered.

You can talk about what the case was about. You can talk about things that happened here in the courtroom. In fact, sometimes, and I don't know whether either of these two gentlemen will do it, or their clients, but sometimes you might be contacted by an attorney who wants to know what did you think of my closing argument or what did you think of this witness or what did you think of this expert? I'm not saying it's going to happen here. It oftentimes doesn't happen. If you are contacted by someone, an attorney in the case or anybody else for that matter, to talk about the case, you can discuss your impression of what happened in the courtroom. If you don't want to talk to that person, you simply tell them firmly that you really don't care to discuss it, and that should be the end of the conversation, and you should not be contacted by that person again.

I'm going to read to you this little notice here.

This is a reminder that you have absolutely no obligation to discuss anything about this case with any member of the press or anyone else. If you do not want to talk to the press and you are contacted by them, I recommend that you immediately and clearly advise the caller that you do not want to discuss anything about the case with anyone. If, after so advising a member of the press or anyone else, you are further bothered or harassed by anyone seeking a statement, please report that fact immediately to the presiding judge, that would be me, who will take appropriate action. Of course, my number is in the book. You can get it online to the extent you need to talk to me.

This notice is also to remind you that if you choose to discuss anything about your jury duty with anyone, including the press, you are, under no circumstances, to discuss or in any way disclose anything about the deliberative process or the vote of any of your fellow jurors, which is what I just said earlier. So if you can abide by that.

When I mentioned jury service earlier, well, two things: First of all, if your spouse or neighbor or sons or coworkers get a jury summons and they start griping about it, please remind them of what I told you earlier, about it being their civic obligation. We really need people to serve and we need people to report for jury duty. Hopefully you'll tell them, Hey, it wasn't all that bad. I kind of enjoyed it to a certain extent. It was interesting. But even if you can't tell them

that, you should encourage them to report. And along the same lines, you will be getting a questionnaire from the folks downstairs, probably in next few weeks, asking you about what you liked about being here and what you didn't like about being here. We want you to be as candid as possible on that. Our feelings won't be hurt if you say you didn't like something. We would like to improve jury service here, and the only way we can really know what to improve upon is to get feedback from people who have served on juries. So please be candid when you fill that form out.

If there is something that you want me to know about, you're free to come back and visit with me today. I'll be around, or any day, really, or like I said, my phone number is in the book. If you think of something over the next few days, Gee it really bothers me that such and such happened, feel free to call. Again, we want feedback, whether the room is too cold, the parking is terrible, you know, those we kind of, we've kind of gotten used to those and we've tried address those as best we can. Unfortunately we're limited in that regard. But if there is something we can do better, let us know. If there is something we're doing well, downstairs or here, we want to know that likewise. So please be very candid with that.

With that, Counsel, is there anything else we need to cover in front of the jury while we're here?

MR. WYNNE: No, Your Honor.

12:15PM MR. BREAUD: No, Your Honor.

12:15PM THE COURT: We're going to go ahead and I think you need to report back downstairs for some final business before you're discharged officially. But again, thank you very much for your participation.

12:15PM THE DEPUTY CLERK: All rise.

12:15PM (WHEREUPON, at this point in the proceedings, the jury panel leaves the courtroom.)

12:15PM THE COURT: If you all will be seated. Is there anything further that we need to cover on the record, while the record is still open?

12:15PM MR. WYNNE: No, Your Honor.

12:15PM MR. BREAUD: No, Your Honor.

12:15PM THE COURT: Mr. Breaud, I'm going to ask you to, we'll go ahead and prepare the judgment here. We'll go ahead and prepare the judgment here based on the jury's verdict. We can give you copies of this, if you would like, before you leave today. We'll go ahead and enter the judgment. Again, thank you all for your hard work on this. In any case, there is always one side that is, any time people go to trial, there is always one side that's satisfied with the result and one side that's not. But that should not be a reflection on the work that the attorneys did on the case, assuming that they've prepared and did all of the work they were supposed to do and the result is what it is. So again, thank you all for your work on this case.

12:16PM MR. BREAUD: Excuse me, Your Honor, I had submitted a verdict on the last one that I don't think was ever filed. If for some reason it got lost in the other case.

12:16PM THE COURT: Yes.

12:17PM MR. BREAUD: In case it got lost, I think Jennifer was handling that one. If for some reason it got lost in the shuffle, I can resubmit it, but we've never received a copy of it.

12:17PM THE COURT: Okay. I think we have it. We'll get it out.

12:17PM MR. BREAUD: I just, if something got lost --

12:17PM THE COURT: No, I think we have it. I'm advised that we have it. We'll go ahead and get it out.

12:17PM MR. BREAUD: Thank you.

12:17PM THE COURT: Thank you.

12:17PM THE DEPUTY CLERK: All rise.

(WHEREUPON, the proceedings at 12:17 p.m. were concluded.)

* * *

REPORTER'S CERTIFICATE

I, Cathy Pepper, Certified Realtime Reporter, Registered Merit Reporter, Certified Court Reporter of the State of Louisiana, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

*s/Cathy Pepper*

Cathy Pepper, CRR, RMR, CCR
Certified Realtime Reporter
Official Court Reporter
United States District Court
Cathy_Pepper@laed.uscourts.gov

## $

**$1,088** [1] - 530:22
**$15,000** [1] - 526:8
**$22,000** [4] - 526:3, 526:5, 526:9, 530:25
**$23,000** [1] - 526:10
**$279,526** [1] - 530:8
**$30,000** [1] - 530:7
**$55,263** [1] - 529:16
**$750,000** [1] - 532:23

## 1

**1** [3] - 530:15, 553:25, 559:21
**1.............................................** [1] - 509:10
**10** [1] - 518:6
**10-311** [1] - 508:5
**11** [1] - 510:17
**1101** [1] - 508:19
**12** [5] - 508:6, 510:2, 511:17, 559:2, 560:7
**1214** [1] - 512:21
**1296** [1] - 513:23
**12:17** [1] - 568:17
**14** [1] - 526:8
**1401** [1] - 508:15
**14th** [1] - 521:11
**15** [3] - 526:11, 528:18, 528:25
**150** [1] - 528:17
**16** [2] - 512:21, 552:8
**174,526** [1] - 530:11
**17th** [1] - 557:4
**19-minute** [1] - 510:21

## 2

**2** [2] - 530:18, 530:21
**20** [4] - 510:13, 510:20, 533:6
**2006** [1] - 553:21
**2008** [7] - 540:5, 540:10, 548:17, 548:24, 549:8, 559:25, 560:5
**2011** [4] - 508:6, 510:2, 559:2, 560:8
**22** [7] - 512:5, 530:22, 530:23, 530:24, 531:19, 531:20, 532:15
**25** [3] - 524:11, 528:10, 528:17
**2550** [1] - 508:15
**26** [1] - 521:25
**27** [1] - 530:7
**2:10-cv-00311** [1] - 548:9

## 3

**3** [2] - 508:9, 530:21
**30** [3] - 518:17, 521:1, 528:10

## 4

**4.7** [1] - 553:20
**40** [3] - 511:18, 515:11, 518:24

## 5

**5** [1] - 508:15
**500** [1] - 508:22
**504** [1] - 508:23
**51** [3] - 553:14, 553:17, 556:17
**51(a)(1** [1] - 556:18
**51(d)(1)(B)** [1] - 556:18
**511** [1] - 509:5
**518** [1] - 509:6
**528** [1] - 509:7
**533** [1] - 509:8
**551** [1] - 509:9
**553** [1] - 509:10
**559** [1] - 509:11
**589-7779** [1] - 508:23

## 6

**60** [2] - 528:22, 528:24
**600** [1] - 508:19

## 7

**7** [1] - 518:6
**70130** [1] - 508:22
**70502** [1] - 508:19
**77010** [1] - 508:16

## 8

**8** [7] - 540:5, 540:10, 548:17, 548:23, 549:8, 559:25, 560:5
**8,140** [3] - 531:21, 531:22
**8:30** [5] - 554:21, 554:24, 555:23, 555:24, 557:11

## A

**a.m** [1] - 555:23
**abide** [1] - 565:17
**ability** [3] - 546:8, 552:1, 569:8
**able** [3] - 526:5, 557:5, 563:3
**aboard** [2] - 540:9, 540:21
**above-entitled** [1] - 569:9
**absolute** [2] - 543:8, 543:12
**absolutely** [2] - 526:4, 565:1
**accept** [5] - 537:23, 537:25, 550:14, 554:1, 555:8
**accepted** [3] - 534:21, 540:18, 542:18
**accident** [40] - 513:5, 513:21, 514:4, 514:8, 514:13, 514:14, 515:4, 515:7, 515:10, 515:12, 516:22, 519:11, 520:8, 520:22, 521:3, 521:12, 521:21, 521:23, 522:12, 522:20, 522:24, 523:20, 524:10, 524:11, 524:12, 524:16, 524:17, 524:18, 525:8, 525:13, 529:2, 541:19, 541:20, 543:24, 544:20, 544:21, 545:23, 549:9
**accident-free** [1] - 543:24
**accommodations** [1] - 516:10
**accomplish** [1] - 557:5
**accordance** [2] - 544:9, 556:17
**accordingly** [1] - 548:4
**accusations** [1] - 561:24
**acknowledge** [1] - 555:10
**Act** [13] - 540:12, 540:14, 540:15, 540:25, 541:12, 541:13, 541:20, 541:25, 542:2, 542:3, 544:23, 544:24, 548:13
**act** [6] - 541:15, 542:1, 544:25, 562:1
**acting** [1] - 542:22
**action** [3] - 534:24, 536:4, 565:10
**Action** [1] - 548:8
**actual** [3] - 545:17, 545:19, 546:11
**add** [6] - 529:12, 529:15, 530:6, 532:19, 554:12
**additional** [2] - 554:13, 555:6
**address** [1] - 566:18
**addressed** [1] - 539:13
**adduced** [1] - 553:1
**adequate** [5] - 543:19, 543:21, 544:1, 544:5, 544:7
**adequately** [2] - 543:1, 549:7
**admirable** [1] - 562:5
**admiration** [1] - 523:17
**admissible** [2] - 534:12, 539:3
**admission** [1] - 528:10
**admitted** [3] - 535:7, 535:8, 550:4
**admonished** [1] - 535:22
**adopted** [1] - 556:2
**advance** [1] - 538:10
**advantage** [1] - 533:3
**advise** [1] - 565:5
**advised** [1] - 568:12
**advises** [1] - 551:16
**advising** [1] - 565:6
**affirmatively** [1] - 552:6
**afford** [1] - 519:25
**afield** [2] - 532:3, 532:5
**afternoon** [2] - 553:15, 553:22
**ago** [3] - 515:12, 517:24, 517:25
**agree** [3] - 512:20, 555:16, 556:22
**agreed** [11] - 512:17, 519:14, 540:13, 552:17, 554:7, 554:22, 554:25, 556:25, 557:2, 557:3, 557:10
**agreed-upon** [2] - 557:2, 557:3
**agreement** [4] - 540:16, 547:14, 557:5, 557:14
**ahead** [18] - 510:12, 510:24, 524:6, 530:19, 531:11, 532:6, 533:20, 533:22, 551:18, 553:9, 554:1, 559:17, 559:20, 567:2, 567:15, 567:18, 568:13
**aid** [1] - 547:23
**aids** [1] - 539:18
**air** [2] - 521:5, 564:4
**ALAN** [1] - 508:18
**Albert** [4] - 514:6, 514:7, 516:3, 517:22
**alleged** [2] - 541:1, 543:6
**allegedly** [2] - 540:20, 546:18
**allow** [1] - 527:18
**allowed** [1] - 545:15
**allowing** [1] - 539:5
**alone** [3] - 534:17, 536:3, 541:19
**ambulance** [1] - 521:5
**amend** [1] - 552:22
**amount** [7] - 526:14, 530:10, 532:11, 543:17, 545:12, 547:2, 547:10
**amounts** [2] - 549:6, 552:20
**analysis** [1] - 535:18
**anguish** [4] - 531:2, 546:5, 546:21, 549:20
**ankle** [3] - 513:10, 515:8, 529:5
**answer** [11] - 517:15, 520:23, 522:3, 524:8, 524:24, 525:7, 539:16, 548:2, 548:4, 548:18, 551:4
**Answer** [2] - 525:2, 525:4
**answered** [3] - 548:25, 549:2, 564:9
**answers** [6] - 522:4, 538:9, 538:16, 550:19, 550:20, 561:2

**apologized** [1] - 521:17
**apparent** [1] - 563:7
**appear** [1] - 520:14
**APPEARANCES** [1] - 508:12
**appliances** [3] - 543:9, 544:2, 544:16
**applicable** [1] - 534:14
**apply** [4] - 530:11, 534:8, 534:15, 544:23
**appreciate** [2] - 518:11, 518:13
**appropriate** [1] - 565:10
**appurtenances** [1] - 543:25
**area** [2] - 523:5, 557:24
**argued** [2] - 531:17, 538:24
**argument** [9] - 531:23, 532:1, 533:2, 533:4, 533:15, 553:13, 553:14, 553:17, 564:15
**arguments** [7] - 510:13, 512:12, 531:9, 535:11, 535:16, 553:22, 555:11
**ARGUMENTS** [6] - 509:5, 509:6, 509:7, 511:1, 518:7, 528:14
**ARNOLD** [1] - 508:14
**arriving** [1] - 536:2
**arrow** [1] - 522:9
**aside** [1] - 561:7
**aspects** [1] - 545:20
**asserting** [1] - 540:22
**assertion** [1] - 543:5
**assigned** [5] - 540:5, 542:25, 543:21, 544:1, 548:9
**assist** [1] - 535:16
**assume** [1] - 535:24
**assuming** [1] - 567:23
**attempt** [1] - 545:21
**attention** [2] - 535:14, 560:18
**attentiveness** [1] - 518:12
**attorney** [5] - 538:25, 539:2, 539:6, 564:14, 564:18
**attorneys** [6] - 538:13, 551:3, 560:25, 561:16, 562:20, 567:23
**August** [8] - 521:11, 540:5, 540:10, 548:17, 548:23, 549:8, 559:25, 560:5
**averaging** [3] - 526:8, 526:9, 526:12
**awake** [1] - 518:13
**award** [7] - 532:23, 545:12, 546:19, 547:5, 547:8, 553:2

## B

**backed** [10] - 512:18, 513:7, 513:16, 514:5, 514:6, 514:25, 515:6, 515:14, 527:14
**backs** [1] - 517:4
**bad** [3] - 512:3, 524:19, 565:24
**balance** [3] - 510:19, 510:23, 528:13
**bar** [1] - 520:3
**based** [7] - 536:20, 545:17, 554:8, 557:1, 557:9, 562:7, 567:16
**beat** [1] - 523:18
**become** [1] - 547:18
**becomes** [1] - 563:7
**BEFORE** [1] - 508:10
**beg** [1] - 527:4
**beggar** [5] - 528:18, 528:19, 531:14, 532:8
**begging** [1] - 527:1
**begin** [3] - 510:24, 519:15, 550:5
**behalf** [3] - 518:11, 553:6, 562:20
**behind** [1] - 549:22
**beliefs** [1] - 547:19
**believes** [1] - 539:2
**below** [2] - 552:7, 552:8
**bench** [3] - 551:24, 552:3, 554:18
**benefits** [4] - 541:8, 541:10, 549:10, 549:12
**best** [6] - 526:1, 529:21, 544:2, 551:22, 566:18, 569:7
**bet** [1] - 519:24
**better** [4] - 512:16, 520:11, 524:13, 566:20
**between** [2] - 534:24, 537:5
**bias** [3] - 534:19, 538:1, 538:2
**bills** [6] - 516:12, 516:20, 519:15, 529:22, 530:20, 532:18
**binding** [1] - 535:20
**bit** [2] - 514:17, 520:11
**bite** [2] - 513:25, 523:12
**bitt** [14] - 513:19, 513:22, 514:1, 514:10, 515:9, 522:25, 523:1, 523:8, 523:13, 524:3, 525:12, 529:3, 529:4, 529:7
**Blackberry** [1] - 550:10
**blame** [1] - 543:15
**blank** [8] - 548:18, 548:24, 549:10, 549:13, 549:14, 549:15, 549:22, 549:25
**blog** [1] - 550:11
**boardinghouse** [1] - 520:3
**boat** [8] - 522:25, 524:4, 524:5, 527:15, 527:21, 527:23, 528:3, 528:9
**boats** [3] - 511:14, 527:12, 528:11
**bodily** [2] - 546:19, 546:23
**book** [2] - 565:10, 566:14
**bothered** [1] - 565:7
**bothers** [1] - 566:15
**bottom** [1] - 552:11
**bounces** [1] - 522:19
**breach** [1] - 541:22
**break** [3] - 554:15, 554:18, 557:15
**breaks** [1] - 529:8
**Breaud** [13] - 510:20, 531:17, 532:3, 532:5, 533:5, 552:16, 552:21, 553:4, 553:9, 554:6, 555:2, 557:4, 567:14
**BREAUD** [25] - 508:18, 508:18, 518:8, 518:11, 528:1, 530:16, 531:7, 531:23, 532:1, 532:24, 552:5, 552:22, 553:12, 555:10, 555:20, 556:5, 556:7, 557:22, 560:11, 567:1, 567:13, 568:1, 568:5, 568:11, 568:14
**Breaud's** [1] - 557:16
**BREAUD.................... ....** [1] - 509:6
**bring** [5] - 519:3, 523:7, 551:1, 551:2, 559:8
**bringing** [1] - 545:8
**brings** [1] - 522:25
**broke** [1] - 529:6
**brought** [2] - 540:11, 544:25
**bruise** [1] - 522:22
**building** [1] - 561:23
**BULLDOG** [1] - 528:24
**bunch** [1] - 520:17
**burden** [1] - 536:5
**bureaucrat** [1] - 562:6
**business** [1] - 567:3
**BY** [10] - 508:14, 508:18, 508:24, 508:25, 509:5, 509:6, 509:7, 511:2, 518:8, 528:15

## C

**calculated** [2] - 549:10, 549:13
**calculation** [1] - 532:18
**California** [2] - 518:22, 523:22
**CALLED** [2] - 510:4, 559:4
**caller** [1] - 565:5
**canceled** [1] - 554:22
**candid** [4] - 564:1, 566:5, 566:9, 566:22
**cannot** [3] - 522:20, 538:11, 545:16
**capable** [1] - 544:15
**capacity** [8] - 546:9, 546:21, 549:12, 551:25, 552:3, 552:9, 552:12, 552:19
**Captain** [20] - 512:23, 514:12, 514:13, 514:18, 514:21, 515:10, 516:2, 517:21, 518:23, 520:4, 520:6, 520:20, 521:6, 521:15, 521:19, 523:25, 527:7, 528:9, 529:1
**captain** [11] - 513:2, 517:11, 521:2, 524:5, 525:18, 527:8, 527:9, 527:20, 528:22
**captive** [1] - 527:19
**care** [10] - 511:25, 516:20, 519:16, 520:24, 542:9, 543:18, 546:12, 546:15, 546:16, 564:22
**carefully** [3] - 533:24, 534:2, 548:11
**cart** [3] - 522:15, 522:16, 522:18
**Carter** [7] - 514:6, 514:7, 514:18, 516:3, 517:22, 517:23, 527:9
**case** [77] - 511:6, 511:8, 512:11, 512:20, 512:25, 513:13, 514:24, 515:19, 515:20, 516:11, 517:9, 521:1, 522:19, 525:15, 527:20, 529:10, 529:12, 529:13, 529:21, 529:22, 530:3, 530:4, 530:8, 530:20, 531:18, 532:7, 532:9, 532:10, 534:4, 534:8, 534:14, 534:17, 534:22, 534:23, 535:7, 535:14, 536:16, 538:3, 538:14, 539:1, 540:1, 540:24, 547:13, 547:15, 547:17, 547:21, 550:8, 550:13, 550:14, 551:6, 551:8, 555:15, 556:24, 557:1, 557:25, 559:13, 561:15, 562:18, 562:20, 562:23, 562:25, 563:8, 563:16, 563:17, 564:10,

564:18, 564:19, 565:2, 565:6, 567:19, 567:23, 567:25, 568:3, 568:5
**cases** [2] - 532:21, 532:22
**cash** [2] - 514:2, 515:2
**Catch** [1] - 523:25
**catch** [2] - 523:25, 526:13
**catches** [1] - 522:25
**catching** [1] - 515:8
**Cathy** [2] - 569:3, 569:13
**CATHY** [1] - 508:21
**Cathy_Pepper@laed.uscourts.gov** [1] - 569:15
**cathy_Pepper@laed.uscourts.gov** [1] - 508:23
**caught** [5] - 513:25, 514:9, 515:7, 517:2, 523:11
**causation** [1] - 544:22
**caused** [12] - 520:22, 528:8, 541:3, 541:20, 542:1, 543:6, 545:1, 546:6, 546:18, 548:16, 549:21, 559:24
**causing** [1] - 545:8
**CCR** [2] - 508:21, 569:13
**cell** [1] - 550:9
**CENTER** [1] - 508:15
**certain** [6] - 526:13, 535:15, 537:4, 542:15, 546:12, 565:24
**CERTIFICATE** [1] - 569:1
**certification** [1] - 551:16
**CERTIFIED** [1] - 508:21
**Certified** [3] - 569:3, 569:4, 569:13
**certify** [1] - 569:6
**chance** [2] - 520:5, 520:7
**change** [3] - 547:18, 551:24, 552:15
**changed** [3] - 514:14, 516:23, 552:2
**charge** [3] - 554:22, 555:15, 557:8
**charges** [1] - 555:13
**CHARGING** [1] - 509:8
**charging** [3] - 533:24, 555:14, 556:3
**chat** [1] - 550:11
**check** [4] - 514:2, 515:2, 519:4, 552:13
**choice** [1] - 527:22
**choose** [3] - 553:2, 563:18, 565:13
**chronology** [1] - 557:18
**circumstances** [7] - 520:21, 537:3, 538:10, 541:18, 542:15, 542:17, 565:14
**circumstantial** [3] - 537:2, 537:5, 537:7
**cited** [2] - 554:11, 555:4
**citizen** [1] - 561:8
**civic** [3] - 561:6, 561:7, 565:22
**Civil** [2] - 548:8, 556:17
**civil** [1] - 536:4
**CIVIL** [1] - 508:5
**civilly** [1] - 561:22
**claim** [12] - 521:13, 536:6, 536:14, 536:15, 540:24, 541:2, 541:9, 541:12, 541:21, 543:4, 544:18, 545:3
**claimed** [4] - 548:15, 548:21, 559:23, 560:2
**claims** [6] - 540:23, 541:5, 541:6, 541:9, 544:23, 544:24
**clean** [1] - 551:19
**clear** [3] - 556:3, 557:16, 557:17
**clearly** [1] - 565:4
**CLERK** [5] - 510:7, 558:5, 559:7, 567:6, 568:16
**client** [4] - 519:7, 519:15, 526:1, 539:4
**clients** [2] - 562:21, 564:13
**clips** [1] - 518:19
**close** [1] - 553:16
**closed** [1] - 527:15
**closing** [11] - 510:12, 530:17, 531:9, 533:2, 533:4, 553:13, 553:14, 553:16, 555:11, 556:5, 564:15
**CLOSING** [6] - 509:5, 509:6, 509:7, 511:1, 518:7, 528:14
**clutch** [1] - 527:24
**Coast** [4] - 516:23, 516:24, 517:5, 521:10
**coil** [2] - 523:12, 523:19
**cold** [1] - 566:16
**combined** [1] - 531:3
**coming** [3] - 528:23, 564:2
**commend** [1] - 563:12
**comments** [1] - 535:22
**committed** [1] - 562:1
**common** [3] - 519:4, 536:18, 536:20
**communicate** [3] - 550:7, 550:13, 550:23
**community** [1] - 534:24
**companies** [4] - 515:23, 516:5, 516:21, 542:12
**company** [9] - 515:16, 515:20, 515:21, 516:10, 526:9, 526:14, 526:15
**compensate** [3] - 547:3, 547:6, 549:7
**compensation** [2] - 545:13, 547:4
**compensatory** [4] - 545:15, 545:18, 545:19, 545:25
**competent** [1] - 543:20
**complete** [1] - 553:23
**compliance** [1] - 553:17
**comply** [1] - 542:3
**comprehensive** [1] - 563:10
**COMPUTER** [1] - 508:25
**computer** [1] - 550:10
**concern** [1] - 557:12
**concerned** [1] - 521:16
**concerning** [2] - 535:23, 537:9
**concise** [1] - 563:10
**concluded** [1] - 568:18
**conclusions** [1] - 536:20
**conclusive** [1] - 542:12
**condition** [9] - 517:18, 543:10, 543:14, 545:4, 545:5, 545:7, 545:10, 546:10, 552:10
**conditions** [1] - 542:8
**conduct** [6] - 546:18, 550:14, 550:17, 551:10, 554:19, 563:13
**conducted** [1] - 542:11
**confer** [1] - 557:1
**conference** [5] - 554:23, 555:1, 555:15, 557:8, 557:9
**confused** [1] - 520:2
**connection** [2] - 553:22, 554:4
**consequence** [1] - 545:10
**consider** [9] - 534:18, 535:6, 536:9, 536:16, 536:25, 537:15, 538:1, 541:5, 545:24
**consideration** [3] - 534:12, 538:18, 547:16
**considered** [4] - 534:23, 538:19, 544:24, 547:25
**considering** [3] - 536:23, 544:13, 547:11
**consist** [1] - 542:3
**contacted** [4] - 564:14, 564:17, 564:23, 565:4
**contention** [1] - 535:17
**context** [1] - 540:14
**continued** [1] - 542:16
**contrary** [2] - 519:13, 536:23
**contributory** [3] - 553:20, 554:14, 555:3
**control** [1] - 511:20
**controls** [1] - 535:19
**convalescing** [1] - 519:18
**convenience** [2] - 531:4, 547:23
**convenient** [2] - 562:12, 562:15
**conversation** [3] - 552:2, 552:4, 564:23
**convinced** [1] - 547:18
**cook** [1] - 516:6
**copies** [1] - 567:17
**copy** [4] - 534:3, 551:19, 553:20, 568:7
**corporation** [1] - 535:1
**Corporation** [1] - 548:8
**corporations** [1] - 535:2
**correct** [2] - 559:13, 569:7
**correction** [1] - 552:10
**correctly** [1] - 552:25
**cost** [1] - 546:11
**Counsel** [1] - 566:23
**counsel** [21] - 510:23, 513:17, 514:1, 515:1, 515:3, 515:15, 516:23, 528:16, 533:1, 533:12, 535:24, 551:15, 554:8, 554:16, 554:22, 555:12, 555:16, 556:21, 556:22, 560:9
**countries** [2] - 561:10, 561:20
**country** [1] - 561:23
**couple** [2] - 512:14, 519:20
**course** [12] - 511:24, 512:2, 512:4, 535:21, 537:12, 538:17, 538:23, 542:23, 563:13, 563:17, 565:10
**courses** [1] - 511:24
**COURT** [46] - 508:1, 508:21, 510:4, 510:10, 510:16, 517:7, 518:5, 527:25, 528:12, 530:19, 531:8, 531:13, 531:16, 531:25, 532:2, 532:25, 533:11, 533:16, 533:19, 551:12, 551:15, 552:7, 552:24, 553:9, 554:1, 555:12, 555:21, 556:6, 556:8, 556:12, 556:20, 557:23, 559:4, 559:8, 559:11, 559:15, 559:17, 559:20, 560:12, 567:2, 567:9,

567:14, 568:4, 568:9, 568:12, 568:15
**court** [15] - 512:7, 516:15, 519:3, 525:15, 526:1, 526:23, 526:24, 535:4, 538:15, 538:21, 549:4, 549:23, 550:25, 551:2, 562:23
**Court** [21] - 511:3, 539:7, 539:12, 548:6, 550:4, 550:16, 551:8, 552:22, 553:18, 553:23, 554:4, 555:10, 556:18, 560:12, 560:13, 560:25, 569:4, 569:5, 569:6, 569:14, 569:14
**Court's** [4] - 553:23, 556:16, 557:1, 560:4
**courtroom** [11] - 510:9, 549:5, 549:24, 551:14, 551:16, 551:19, 559:10, 559:18, 564:11, 564:20, 567:8
**cover** [9] - 533:3, 533:7, 533:20, 533:23, 534:1, 560:15, 563:14, 566:24, 567:10
**covered** [3] - 531:13, 533:4, 555:7
**coworkers** [1] - 565:20
**credibility** [2] - 538:19, 539:10
**credit** [1] - 557:5
**crew** [8] - 541:24, 543:7, 543:20, 543:21, 544:1, 544:5, 544:7, 544:16
**crewmember** [1] - 521:16
**crews** [1] - 544:3
**crime** [1] - 562:1
**crimes** [1] - 561:24
**criminally** [1] - 561:22
**criticism** [1] - 556:21
**criticisms** [1] - 518:16
**criticizing** [1] - 518:23
**CRR** [2] - 508:21, 569:13
**crushed** [1] - 516:4
**cut** [1] - 522:23
**cutting** [1] - 520:9

## D

**damage** [3] - 544:24, 545:1, 547:5
**damages** [18] - 531:3, 532:12, 540:19, 541:8, 541:10, 543:4, 545:13, 545:15, 545:16, 545:17, 545:18, 545:19, 545:25, 546:1, 546:19, 547:3, 549:8, 562:2
**date** [4] - 540:7, 549:3, 549:23, 549:25
**dated** [1] - 560:7
**DAY** [1] - 508:9
**Daybrook** [1] - 520:6
**days** [14] - 511:8, 513:21, 514:3, 515:23, 531:21, 531:22, 560:18, 561:18, 562:10, 562:13, 563:11, 563:12, 566:14
**deadline** [2] - 555:24, 557:10
**December** [3] - 554:6, 556:24, 557:4
**decide** [8] - 537:24, 547:15, 548:2, 548:3, 561:17, 561:25, 562:6, 562:8
**decided** [1] - 534:23
**deciding** [2] - 537:25, 562:18
**decision** [3] - 519:6, 547:23, 562:7
**deck** [4] - 523:1, 523:2, 523:3, 529:4
**deckhand** [1] - 523:23
**deckhands** [1] - 525:21
**decks** [1] - 543:8
**deductions** [1] - 536:19
**defend** [1] - 518:24
**DEFENDANT** [1] - 508:18
**defendant** [16] - 536:15, 540:4, 540:8, 540:14, 540:19, 541:14, 542:6, 542:10, 542:11, 542:13, 542:25, 543:2, 544:14, 544:18, 548:14, 559:22
**defendant's** [1] - 546:18
**defendants** [3] - 540:1, 540:23, 545:11
**defending** [3] - 521:2, 521:6, 525:15
**defense** [7] - 513:17, 514:1, 514:25, 515:3, 515:15, 516:22, 528:16
**defense's** [1] - 533:4
**defined** [2] - 548:23, 560:4
**delegate** [1] - 543:13
**deliberate** [4] - 534:4, 550:2, 558:3, 561:1
**deliberates** [1] - 558:7
**DELIBERATES.................................** [1] - 509:9
**deliberating** [1] - 555:24
**deliberations** [7] - 534:20, 550:5, 550:6, 550:15, 550:24, 551:11, 551:14
**deliberative** [1] - 565:15
**deposition** [5] - 518:20, 538:8, 538:13, 538:17
**depositions** [1] - 538:8
**deputy** [4] - 550:25, 551:16, 551:19, 559:18
**DEPUTY** [5] - 510:7, 558:5, 559:7, 567:6, 568:16
**described** [3] - 523:5, 524:2, 554:19
**describing** [1] - 527:7
**description** [1] - 516:24
**descriptions** [1] - 521:23
**despite** [1] - 516:8
**detail** [1] - 537:18
**determination** [3] - 520:18, 520:19, 532:13
**determine** [6] - 519:8, 534:11, 535:5, 542:14, 547:2, 547:10
**determining** [2] - 536:8, 544:22
**device** [1] - 550:8
**differ** [1] - 539:18
**difference** [1] - 526:14
**different** [3] - 523:17, 524:10, 544:23
**differently** [1] - 547:20
**difficult** [1] - 560:23
**diminished** [1] - 549:12
**direct** [4] - 537:1, 537:5, 537:7, 545:9
**directed** [1] - 550:21
**disability** [5] - 546:2, 546:6, 546:20, 549:17, 549:21
**disagreement** [2] - 554:24, 564:6
**discharged** [3] - 550:21, 561:3, 567:4
**disclose** [3] - 550:22, 551:3, 565:15
**discovered** [1] - 557:7
**discretion** [1] - 556:19
**discuss** [13] - 547:13, 551:23, 555:14, 563:16, 563:17, 563:18, 563:20, 564:19, 564:22, 565:2, 565:5, 565:13, 565:14
**discussed** [1] - 530:17
**discussing** [1] - 547:17
**discussion** [6] - 553:15, 554:3, 554:16, 555:4, 564:1, 564:6
**discussions** [1] - 563:22
**disfigurement** [2] - 546:21, 549:17
**disprove** [1] - 537:3
**dispute** [2] - 532:12, 554:24
**disputes** [4] - 561:12, 561:22, 561:24, 562:5
**disregard** [2] - 536:1, 539:13
**distinction** [1] - 537:5
**DISTRICT** [3] - 508:1, 508:1, 508:10
**District** [5] - 548:6, 548:7, 569:5, 569:6, 569:14
**distrust** [2] - 537:9, 537:10
**division** [1] - 550:22
**DOCKET** [1] - 508:5
**doctor** [1] - 530:1
**document** [3] - 515:6, 521:6, 521:9
**documents** [2] - 512:13, 554:21
**dollar** [5] - 549:11, 549:13, 549:14, 549:15, 549:21
**dollars** [1] - 516:16
**done** [5] - 512:17, 524:11, 528:6, 533:2, 562:24
**door** [1] - 519:4
**down** [5] - 514:17, 521:3, 523:3, 524:1, 532:17
**downstairs** [3] - 566:3, 566:21, 567:3
**downward** [2] - 512:5, 520:10
**Dr** [1] - 530:23
**drafted** [1] - 555:25
**draw** [3] - 536:17, 539:3, 539:14
**drifting** [4] - 524:4, 524:5, 528:4
**driving** [1] - 528:9
**due** [2] - 546:9, 552:9
**duration** [1] - 511:8
**during** [17] - 535:21, 536:2, 538:7, 538:17, 538:23, 539:17, 550:6, 550:15, 550:17, 550:23, 551:24, 552:17, 554:15, 554:17, 554:18, 563:13, 563:15
**duty** [19] - 523:23, 534:10, 534:13, 534:14, 535:5, 538:25, 541:22, 541:23, 542:4, 543:8, 543:11, 543:13, 543:18, 543:19, 547:13, 561:6, 565:13, 565:23

## E

**e-mail** [1] - 557:3
**early** [1] - 556:24
**earn** [2] - 526:2, 546:8
**earning** [7] - 546:9, 549:12, 551:25, 552:3, 552:9, 552:12, 552:19
**earnings** [3] - 526:11,

549:9, 549:11
**EASTERN** [1] - 508:1
**Eastern** [2] - 548:7, 569:6
**economic** [2] - 546:6, 549:21
**effect** [6] - 534:9, 539:8, 539:11, 546:3, 547:11, 549:18
**effort** [2] - 547:14, 563:9
**efforts** [1] - 563:13
**eight** [1] - 510:14
**either** [8] - 541:7, 544:10, 545:9, 551:1, 553:6, 555:15, 556:21, 564:12
**electronic** [1] - 550:8
**element** [3] - 536:5, 536:7, 536:14
**elements** [3] - 531:3, 545:24, 547:5
**employed** [2] - 540:4, 543:7
**employee** [1] - 542:22
**employees** [4] - 541:23, 542:5, 542:22, 544:14
**employer** [6] - 540:15, 540:25, 541:14, 541:22, 542:2, 542:21
**employer's** [1] - 541:25
**employers** [1] - 542:4
**employment** [1] - 542:23
**encourage** [1] - 566:1
**end** [4] - 522:17, 523:4, 534:13, 564:22
**ends** [1] - 531:20
**ENGELHARDT** [1] - 508:10
**enjoyed** [1] - 565:24
**enjoyment** [1] - 546:22
**enter** [1] - 567:18
**enters** [2] - 510:9, 559:10
**entire** [1] - 511:17
**entirely** [1] - 539:14
**entities** [1] - 535:3
**entitled** [7] - 538:18, 539:23, 540:12, 547:11, 548:6, 548:10, 569:9
**entity** [1] - 535:1
**envelope** [1] - 559:18
**equal** [3] - 534:24, 534:25, 535:3
**equals** [1] - 535:4
**equipment** [2] - 543:9, 544:3
**ESQUIRE** [2] - 508:14, 508:18
**essential** [3] - 536:5, 536:7, 536:13
**establish** [1] - 536:13
**established** [1] - 546:1
**evening** [2] - 554:19, 555:22
**evidence** [84] - 512:12, 512:18, 513:6, 513:13, 513:15, 514:20, 514:24, 515:14, 515:19, 515:20, 517:10, 517:11, 517:12, 517:13, 517:25, 518:2, 519:5, 519:14, 519:16, 519:21, 521:7, 521:9, 522:2, 528:2, 528:8, 529:10, 529:12, 529:13, 529:15, 529:16, 530:7, 530:11, 531:18, 532:7, 532:9, 532:22, 533:15, 534:7, 534:12, 534:16, 535:6, 535:7, 535:11, 535:17, 535:19, 536:6, 536:9, 536:11, 536:15, 536:16, 536:24, 536:25, 537:1, 537:2, 537:5, 537:7, 538:2, 538:4, 538:24, 539:2, 539:6, 539:8, 539:11, 539:20, 539:22, 542:24, 545:12, 546:1, 546:12, 546:24, 547:7, 547:16, 548:14, 548:20, 550:4, 553:1, 553:16, 559:22, 560:1, 561:1, 562:7
**exact** [4] - 513:3, 513:4, 547:4, 553:18
**exactly** [4] - 514:4, 524:20, 560:23
**exaggerating** [1] - 530:2
**exaggeration** [1] - 520:16
**exaggerator** [1] - 530:3
**EXAMINATIONS** [1] - 509:3
**examine** [1] - 547:17
**example** [2] - 522:15, 527:15
**exceed** [2] - 510:18, 533:6
**exceeding** [1] - 546:11
**except** [3] - 521:21, 530:5, 535:25
**exception** [1] - 551:23
**excluded** [1] - 557:7
**excruciating** [1] - 520:14
**excuse** [4] - 530:15, 530:16, 532:24, 568:1
**excuses** [1] - 543:18
**exercise** [1] - 542:9
**Exhibit** [6] - 512:21, 521:25, 530:15, 530:18, 530:21
**exhibit** [1] - 530:14
**exhibits** [6] - 519:5, 535:8, 536:11, 536:18, 550:3, 551:17
**existence** [1] - 537:3
**expect** [2] - 534:22, 560:24
**expenses** [7] - 529:19, 530:14, 530:22, 530:25, 546:10, 549:13, 549:15
**experience** [6] - 515:11, 519:3, 528:10, 536:19, 537:21, 546:23
**experienced** [1] - 546:22
**expert** [10] - 526:13, 526:16, 533:13, 533:14, 537:21, 538:1, 538:3, 538:5, 552:18, 564:16
**expired** [1] - 533:16
**explain** [1] - 544:11
**explained** [1] - 544:10
**expose** [1] - 561:16
**expression** [1] - 557:12
**expressly** [1] - 539:7
**extent** [6] - 534:6, 545:25, 553:15, 564:5, 565:11, 565:25
**Exxon** [2] - 526:13, 526:15
**eyewitness** [1] - 537:1

## F

**F/V** [8] - 540:6, 540:7, 540:9, 540:21, 541:3, 543:5, 548:20, 560:2
**face** [1] - 561:12
**Facebook** [1] - 550:12
**fact** [23] - 512:19, 514:3, 514:11, 515:8, 516:8, 520:17, 522:3, 527:9, 533:16, 533:17, 536:8, 536:22, 537:18, 540:17, 542:11, 542:15, 556:23, 561:11, 562:10, 563:1, 564:8, 564:12, 565:8
**factor** [1] - 545:8
**facts** [11] - 534:16, 535:6, 535:15, 535:25, 536:3, 537:4, 537:6, 548:3, 555:6, 561:17
**fail** [1] - 536:13
**failed** [1] - 542:7
**failure** [4] - 520:20, 541:16, 542:3, 544:25
**fair** [1] - 535:1
**fairly** [3] - 547:3, 547:6, 549:7
**faker** [1] - 532:8
**falsehood** [1] - 537:16
**falsely** [1] - 537:8
**familiar** [2] - 562:22, 562:24
**family** [1] - 562:13
**far** [4] - 532:5, 532:11, 557:23, 562:6
**fast** [3] - 513:1, 517:11, 527:8
**faucet** [1] - 522:17
**fault** [3] - 543:14, 554:14, 555:3
**fear** [1] - 564:2
**features** [1] - 562:4
**Federal** [1] - 556:17
**federal** [7] - 516:14, 516:18, 540:12, 540:23, 540:24, 543:6, 547:9
**feedback** [2] - 566:8, 566:16
**feelings** [3] - 546:6, 549:20, 566:5
**feet** [5] - 522:10, 523:1, 523:7, 523:24, 528:25
**fellow** [1] - 565:16
**ferry** [4] - 527:14, 527:16, 527:17, 527:18
**few** [5] - 543:21, 560:15, 560:16, 566:3, 566:14
**field** [1] - 537:21
**figure** [2] - 523:17, 523:18
**filed** [2] - 521:8, 568:2
**files** [1] - 521:8
**fill** [2] - 550:19, 566:9
**filling** [1] - 531:12
**final** [4] - 535:18, 554:20, 555:22, 567:3
**findings** [1] - 536:2
**fine** [2] - 525:1, 525:2
**finest** [1] - 544:3
**fingers** [1] - 521:19
**finish** [1] - 547:20
**firm** [1] - 526:1
**firmly** [1] - 564:21
**first** [18] - 511:10, 511:11, 511:24, 512:11, 512:14, 512:15, 514:24, 517:9, 521:1, 531:13, 540:24, 551:3, 554:10, 555:21, 556:22, 560:15, 563:6, 565:19
**firsthand** [1] - 513:5
**fish** [1] - 526:12
**fisherman** [3] - 516:8, 528:17, 540:4
**fishermen** [1] - 525:22
**fishing** [2] - 515:18, 540:2
**fit** [4] - 517:19, 543:11, 543:17, 543:25
**five** [6] - 513:14, 520:12, 531:19, 540:11, 563:11
**fixed** [3] - 529:3, 529:4, 529:7
**fixing** [1] - 547:4
**flashbacks** [1] - 513:11
**flew** [1] - 518:24

**flip** [1] - 557:6
**folks** [2] - 561:25, 566:2
**follow** [4] - 534:2, 534:15, 548:11, 550:15
**following** [3] - 545:24, 555:13, 556:19
**follows** [1] - 544:20
**foot** [2] - 517:2, 523:11
**FOR** [2] - 508:14, 508:18
**foregoing** [1] - 569:7
**foreman** [1] - 559:15
**foremost** [1] - 560:16
**foreperson** [5] - 550:1, 550:5, 550:19, 550:24, 560:7
**FOREPERSON** [2] - 559:14, 559:16
**Form** [1] - 548:10
**form** [29] - 517:8, 520:23, 522:7, 538:12, 547:22, 547:24, 548:1, 548:5, 549:3, 549:23, 550:19, 551:5, 551:6, 551:19, 553:4, 553:7, 553:24, 553:25, 554:13, 554:20, 555:1, 555:13, 555:16, 556:1, 556:23, 557:3, 557:19, 559:21, 566:9
**four** [6] - 512:7, 517:5, 524:9, 524:10, 525:21, 540:9
**Frank** [6] - 512:22, 512:25, 514:5, 514:22, 516:1
**freak** [1] - 524:12
**free** [4] - 543:24, 563:17, 566:12, 566:15
**fresh** [2] - 517:23
**fringe** [2] - 549:9, 549:12
**front** [2] - 528:25, 566:24
**full** [2] - 545:13, 547:15
**function** [1] - 535:12
**fundamental** [1] - 562:9
**furnish** [3] - 542:7, 543:24
**future** [14] - 529:19, 530:25, 531:2, 546:5, 546:7, 546:8, 546:13, 546:23, 549:11, 549:15, 549:16, 549:20, 552:1

## G

**gear** [3] - 543:9, 544:4, 544:16
**Gee** [1] - 566:14
**General** [1] - 540:12
**generous** [1] - 527:3
**gentlemen** [10] - 511:4, 518:9, 522:14, 527:5, 528:5, 533:19, 559:11, 562:21, 563:8, 564:13
**given** [8] - 517:8, 520:1, 525:17, 527:20, 534:3, 541:21, 543:22, 550:16
**globe** [1] - 561:12
**GNO's** [1] - 527:14
**goodness** [1] - 516:17
**government** [1] - 547:9
**grab** [3] - 523:7, 523:15, 528:6
**grand** [1] - 552:20
**Granger** [1] - 530:23
**grass** [1] - 520:9
**grease** [1] - 525:4
**great** [2] - 561:17, 563:23
**greater** [2] - 536:22, 539:23
**grinding** [1] - 517:23
**griping** [1] - 565:20
**group** [2] - 534:5, 561:4
**Guard** [4] - 516:23, 516:24, 517:5, 521:10
**guess** [2] - 525:9, 557:5
**guilty** [1] - 562:1
**guy** [4] - 523:22, 526:25, 527:2, 527:16
**guys** [2] - 511:13, 525:21

## H

**half** [9] - 514:5, 515:12, 517:25, 532:14, 560:18, 562:10, 562:13, 563:11, 563:12
**hand** [3] - 511:16, 511:18, 559:17
**handling** [3] - 523:23, 557:1, 568:6
**harassed** [1] - 565:7
**hard** [7] - 514:19, 519:2, 519:3, 523:16, 557:13, 562:17, 567:19
**hard-working** [1] - 523:16
**harder** [2] - 563:4, 563:5
**HB406** [1] - 508:22
**head** [1] - 552:6
**hear** [10] - 514:18, 518:15, 518:16, 529:17, 530:1, 555:12, 558:1, 558:4, 561:19
**HEARD** [1] - 508:10
**heard** [13] - 512:17, 512:23, 512:24, 523:9, 527:9, 529:18, 529:20, 530:22, 530:23, 531:1, 534:7, 538:23, 555:5
**hearing** [2] - 538:25, 554:21
**heart** [1] - 516:17
**held** [1] - 554:23
**help** [1] - 511:15
**helpful** [2] - 535:13, 537:20
**hereby** [1] - 569:6
**hesitate** [1] - 547:17
**himself** [6] - 518:25, 521:14, 521:20, 522:1, 525:10, 528:3
**hit** [4] - 516:15, 528:2, 529:4, 529:5
**hits** [1] - 522:18
**holding** [1] - 534:25
**honest** [4] - 530:2, 547:19, 552:1, 564:1
**Honor** [21] - 510:15, 518:4, 528:16, 530:16, 531:7, 531:15, 531:24, 532:24, 533:10, 553:8, 553:12, 556:11, 557:21, 557:22, 560:10, 560:11, 566:25, 567:1, 567:12, 567:13, 568:1
**HONORABLE** [1] - 508:10
**hope** [2] - 520:23, 555:23
**hopefully** [2] - 557:17, 565:23
**hoping** [1] - 560:20
**hose** [8] - 522:15, 522:16, 522:17, 522:18, 523:6, 523:15
**hospital** [5] - 514:9, 515:23, 521:5, 521:16, 521:17
**hospitalization** [1] - 546:16
**hotel** [1] - 527:2
**hour** [3] - 518:20, 558:1, 558:3
**house** [1] - 520:9
**HOUSTON** [2] - 508:15, 508:16
**hundreds** [1] - 516:15
**hurt** [4] - 512:2, 516:11, 531:15, 566:6

## I

**Ibarra** [1] - 559:15
**idea** [2] - 520:1, 556:24
**immediately** [4] - 519:16, 553:16, 565:4, 565:8
**impairment** [7] - 531:2, 546:3, 546:7, 546:8, 549:17, 551:25, 552:12
**important** [7] - 523:21, 537:18, 561:6, 561:8, 561:21, 562:3, 562:15
**impossible** [4] - 515:8, 515:9, 528:6, 529:3
**impression** [2] - 539:24, 564:19
**improve** [2] - 566:7, 566:8
**Inc** [1] - 540:4
**INC** [1] - 508:7
**include** [4] - 545:20, 546:15, 553:19, 555:3
**includes** [3] - 535:7, 541:22, 543:19
**including** [9] - 538:2, 541:23, 546:2, 546:8, 549:9, 549:11, 549:16, 563:16, 565:14
**income** [10] - 538:5, 538:6, 546:7, 546:8, 547:9, 551:23, 552:3, 552:13, 552:19
**inconvenience** [4] - 546:3, 546:4, 549:17, 549:18
**incorporate** [1] - 553:24
**Incorporated** [4] - 540:2, 540:20, 548:15, 559:23
**incorrect** [1] - 552:25
**independent** [1] - 539:21
**indicate** [1] - 539:7
**indicated** [4] - 510:12, 553:4, 553:10, 555:2
**indicates** [2] - 519:16, 521:9
**indirect** [1] - 537:2
**individual** [1] - 535:2
**infer** [1] - 538:2
**inference** [2] - 539:3, 539:14
**inferences** [2] - 535:15, 536:17
**influenced** [1] - 539:22
**inform** [2] - 549:3, 549:23
**information** [4] - 518:22, 519:9, 550:7, 550:13
**injured** [3] - 528:7, 540:9, 542:6
**injures** [1] - 542:20
**injuries** [8] - 540:20, 541:1, 541:4, 543:6, 546:4, 546:17, 547:6, 549:18
**injury** [28] - 513:9, 519:13, 522:22, 528:4, 528:8, 531:8, 531:17, 531:19, 532:4, 542:1, 544:11, 544:20, 544:22, 544:24, 545:1, 545:5, 545:9, 545:21, 546:13,

546:19, 546:23, 548:17, 548:24, 549:9, 559:25, 560:5
**innocent** [1] - 537:16
**insecurity** [2] - 546:6, 549:21
**insofar** [1] - 538:20
**instant** [1] - 550:11
**instruct** [2] - 534:8, 534:14
**instructed** [1] - 555:12
**instruction** [7] - 534:17, 553:19, 553:21, 553:24, 555:5, 556:23, 560:5
**instructions** [26] - 519:6, 533:23, 533:25, 534:18, 535:12, 535:25, 548:11, 548:23, 550:3, 550:16, 551:20, 551:21, 553:3, 553:7, 553:23, 554:5, 554:7, 554:11, 554:19, 554:20, 554:24, 555:16, 555:25, 557:2, 557:18
**intangible** [2] - 545:21, 546:24
**intended** [8] - 517:19, 535:16, 543:11, 543:17, 543:25, 544:5, 544:17, 556:21
**intentional** [1] - 537:15
**interest** [2] - 560:17, 562:16
**interesting** [1] - 565:25
**Internet** [2] - 550:10, 550:11
**interpretation** [2] - 535:19, 541:21
**interview** [1] - 515:24
**introduced** [2] - 539:6, 547:1
**investigate** [1] - 521:12
**investigator** [2] - 515:23, 515:25
**involved** [5] - 518:21, 522:10, 522:11, 554:9, 561:15
**iPhone** [1] - 550:9
**issue** [5] - 527:6, 552:16, 554:13, 554:16, 555:18
**item** [1] - 563:14
**ITKIN** [1] - 508:14
**itself** [3] - 531:17, 532:4, 555:5

## J

**January** [1] - 560:7
**JANUARY** [3] - 508:6, 510:2, 559:2
**Jefferson** [2] - 519:1
**JEFFERSON** [1] - 508:19
**Jennifer** [1] - 568:5
**job** [10] - 511:15, 516:6, 516:7, 520:4, 526:17, 526:19, 527:4, 562:13, 562:25
**joint** [2] - 554:5, 557:2
**Jones** [13] - 540:12, 540:14, 540:15, 540:25, 541:12, 541:13, 541:20, 541:25, 542:2, 542:3, 544:23, 544:24, 548:13
**Judge** [1] - 518:12
**judge** [1] - 565:9
**JUDGE** [1] - 508:10
**judge's** [1] - 548:10
**Judge's** [1] - 519:6
**judged** [1] - 538:18
**judges** [4] - 534:9, 534:10, 536:3, 539:10
**judgment** [5] - 547:25, 560:13, 567:15, 567:16, 567:18
**jump** [1] - 524:2
**juries** [3] - 561:11, 562:5, 566:9
**juror** [3] - 539:20, 539:24, 547:25
**jurors** [5] - 534:21, 539:23, 547:13, 560:24, 565:16
**JURORS** [2] - 511:5, 518:10
**JURY** [2] - 508:9, 509:9
**jury** [75] - 510:8, 512:8, 519:8, 520:23, 522:15, 526:21, 526:22, 533:20, 533:23, 533:24, 534:9, 534:10, 537:20, 538:25, 539:9, 539:13, 547:16, 547:24, 548:23, 550:1, 550:2, 551:10, 551:13, 551:17, 553:3, 553:19, 553:20, 553:23, 553:25, 554:5, 554:7, 554:13, 554:22, 554:24, 555:1, 555:13, 555:14, 555:23, 556:3, 556:22, 557:25, 558:7, 559:8, 559:9, 559:12, 559:15, 559:21, 560:5, 560:9, 560:14, 560:20, 561:5, 561:8, 561:13, 561:21, 562:8, 563:5, 563:19, 563:21, 563:24, 564:2, 564:4, 564:7, 564:8, 565:13, 565:18, 565:20, 565:23, 566:7, 566:24, 567:7
**Jury** [2] - 534:7, 548:10
**jury's** [2] - 560:12, 567:16
**JURY........................ ............** [1] - 509:8
**justice** [3] - 535:4, 561:10, 562:4
**justified** [1] - 536:18

## K

**keep** [3] - 537:11, 543:8, 564:7
**keeps** [1] - 520:12
**Kelley** [9] - 512:22, 513:3, 514:6, 515:25, 517:20, 523:4, 523:9, 525:17, 527:10
**kind** [3] - 565:24, 566:17
**kink** [3] - 523:5, 523:6, 529:3
**kinks** [4] - 513:1, 517:12, 523:4, 523:6
**knowledge** [3] - 513:5, 537:19, 555:14
**known** [1] - 540:24
**KURT** [1] - 508:10

## L

**LA** [2] - 508:19, 508:22
**ladies** [7] - 511:3, 518:9, 522:13, 527:5, 528:5, 533:19, 559:11
**lady** [1] - 521:2
**Lafayette** [2] - 527:2, 527:3
**LAFAYETTE** [1] - 508:19
**laid** [1] - 523:3
**language** [1] - 553:18
**lapse** [1] - 537:16
**last** [8] - 511:6, 514:5, 527:13, 530:25, 532:14, 560:18, 562:13, 568:2
**lasted** [1] - 563:1
**Law** [1] - 540:13
**law** [23] - 511:12, 516:14, 516:18, 526:1, 534:8, 534:12, 534:14, 534:15, 534:16, 534:18, 535:4, 535:12, 536:1, 537:4, 540:12, 540:23, 540:24, 541:8, 542:4, 543:6, 544:9, 545:17, 556:19
**lawsuit** [4] - 521:8, 521:22, 540:11, 540:18
**lawyer** [11] - 511:12, 511:15, 511:19, 518:18, 519:25, 520:1, 525:18, 527:10, 529:18, 530:5, 539:4
**lawyers** [6] - 519:23, 535:11, 535:12, 535:20, 535:22, 563:1
**lawyers'** [1] - 535:15
**laying** [1] - 523:10
**lean** [1] - 511:15
**leave** [2] - 552:24, 567:17
**leaves** [2] - 551:14, 567:8
**left** [1] - 518:6
**leg** [10] - 514:9, 516:4, 522:10, 522:19, 522:22, 522:25, 523:7, 523:16, 529:6
**legal** [1] - 518:15
**legally** [1] - 542:21
**lengthy** [1] - 553:15
**less** [2] - 533:8, 534:22
**liability** [2] - 532:11, 543:13
**liable** [4] - 542:2, 544:13, 544:18, 545:11
**liberal** [1] - 541:21
**life** [11] - 511:12, 511:13, 512:5, 513:15, 520:11, 530:23, 532:14, 534:25, 546:5, 546:22, 549:19
**lifted** [1] - 528:17
**light** [3] - 536:18, 547:7, 553:1
**likely** [1] - 536:8
**likewise** [1] - 566:22
**limitation** [1] - 563:18
**limited** [5] - 531:10, 532:2, 532:25, 533:7, 566:19
**limp** [1] - 531:22
**line** [9] - 513:1, 513:25, 514:9, 516:23, 518:20, 522:6, 529:3, 549:25
**lines** [2] - 552:11, 566:2
**LinkedIn** [1] - 550:12
**Listen** [1] - 512:11
**listen** [14] - 512:12, 512:13, 512:24, 512:25, 514:22, 519:4, 519:6, 519:19, 522:3, 533:12, 533:24, 534:2, 560:24, 560:25
**live** [1] - 527:13
**living** [1] - 520:3
**local** [2] - 526:14, 526:15
**lock** [3] - 527:15, 528:1, 528:3
**lockmaster** [1] - 527:23
**long-accepted** [1] - 542:18
**look** [9] - 517:1, 517:9, 519:5, 524:20, 526:17, 529:23, 532:22, 532:25, 561:9
**looked** [1] - 529:24
**loop** [3] - 513:24,

514:10, 514:12
**loose** [1] - 522:17
**lose** [1] - 530:7
**loss** [9] - 529:14, 545:19, 546:21, 549:9, 549:11, 552:3, 552:13, 552:18, 552:19
**losses** [1] - 529:20
**lost** [5] - 546:7, 568:3, 568:5, 568:6, 568:11
**lottery** [1] - 520:25
**LOUISIANA** [2] - 508:1, 508:5
**Louisiana** [3] - 548:7, 569:5, 569:6
**lunch** [2] - 558:2, 558:3
**lying** [1] - 530:4

## M

**M/V** [1] - 548:8
**magistrate** [1] - 548:9
**magnifying** [1] - 530:5
**maid** [1] - 527:1
**mail** [1] - 557:3
**maintain** [1] - 543:8
**Man** [1] - 524:1
**man** [18] - 515:11, 516:4, 520:9, 521:4, 521:17, 521:19, 528:10, 528:17, 528:18, 528:19, 529:25, 530:2, 530:3, 530:4, 530:5, 531:21, 531:22, 532:8
**man's** [2] - 530:23, 531:18
**manipulated** [1] - 525:22
**manner** [9] - 524:15, 528:9, 535:23, 542:12, 544:9, 548:15, 548:21, 559:23, 560:2
**manpower** [1] - 544:7
**Maritime** [1] - 540:12
**mark** [1] - 510:21
**marked** [1] - 524:9
**marshal** [1] - 551:1
**marvel** [1] - 561:21
**material** [1] - 537:9
**mathematical** [1] - 532:18
**matter** [6] - 529:8, 533:16, 537:9, 537:19, 564:19, 569:9
**matters** [3] - 537:10, 537:23, 562:22
**MCKINNEY** [1] - 508:15
**mean** [5] - 522:13, 537:13, 541:20, 542:16, 556:20
**means** [3] - 517:18, 545:6, 550:8
**MECHANICAL** [1] - 508:24
**media** [1] - 550:9
**medical** [18] - 513:13, 516:9, 516:12, 516:20, 519:15, 529:22, 529:23, 530:14, 530:20, 530:22, 530:25, 532:18, 546:10, 546:11, 546:15, 546:16, 549:13, 549:15
**medication** [3] - 515:24, 516:4, 522:1
**member** [3] - 543:7, 565:2, 565:6
**Members** [1] - 534:7
**members** [1] - 547:16
**memory** [4] - 537:16, 539:18, 539:19
**men** [1] - 518:23
**mental** [7] - 522:2, 531:2, 545:20, 546:5, 546:21, 546:25, 549:20
**mentioned** [2] - 561:4, 565:18
**menu** [1] - 558:2
**merely** [4] - 542:20, 545:4, 547:20, 548:3
**Merit** [1] - 569:4
**message** [3] - 550:24, 551:2, 551:4
**messaging** [1] - 550:11
**met** [2] - 511:11
**MEYERS** [1] - 508:18
**midmorning** [6] - 554:15, 554:18, 555:1, 555:17, 556:1, 557:15
**might** [2] - 554:12, 564:13
**mind** [2] - 537:11, 547:18
**minute** [5] - 510:17, 510:22, 517:7, 524:1, 527:25
**minutes** [8] - 510:13, 510:14, 510:17, 510:20, 511:18, 518:6, 533:6
**misstatement** [2] - 537:14, 537:15
**mistake** [1] - 537:12
**modify** [1] - 552:14
**Monday** [6] - 554:19, 555:22, 560:19, 561:5, 561:13
**monetary** [3] - 540:19, 543:4, 549:6
**money** [10] - 519:17, 520:17, 526:6, 526:14, 526:25, 527:1, 530:6, 530:10, 545:20
**month** [1] - 520:7
**months** [3] - 511:17, 517:5, 561:19
**MOORE** [1] - 508:4
**Moore** [52] - 511:10, 511:22, 512:3, 513:1, 513:4, 513:8, 513:18, 513:21, 513:23, 514:3, 514:8, 514:11, 514:18, 514:20, 515:4, 516:6, 517:20, 519:10, 519:17, 519:24, 520:9, 520:12, 520:13, 520:24, 521:14, 522:1, 524:2, 524:9, 524:17, 525:10, 526:2, 526:3, 528:3, 528:7, 529:10, 529:14, 536:5, 540:1, 540:3, 540:5, 540:9, 540:11, 540:13, 540:19, 541:13, 548:7, 548:16, 548:21, 549:7, 559:24, 560:3
**Moore's** [9] - 512:6, 513:20, 516:24, 516:25, 540:15, 548:17, 548:23, 559:25, 560:5
**morning** [12] - 510:12, 511:3, 511:5, 512:14, 518:9, 518:10, 555:23, 556:3, 557:11, 560:19, 561:5, 561:14
**most** [7] - 519:1, 528:25, 535:13, 561:6, 561:8, 562:4
**move** [1] - 533:11
**moving** [1] - 522:18
**MR** [48] - 509:5, 509:6, 509:7, 510:15, 511:2, 511:6, 517:8, 518:8, 518:11, 528:1, 528:15, 530:16, 530:18, 530:20, 531:7, 531:12, 531:14, 531:18, 531:23, 532:1, 532:7, 532:24, 533:10, 533:12, 533:18, 552:5, 552:6, 552:22, 553:8, 553:12, 555:10, 555:20, 556:5, 556:7, 556:10, 556:16, 557:21, 557:22, 560:10, 560:11, 566:25, 567:1, 567:12, 567:13, 568:1, 568:5, 568:11, 568:14
**must** [24] - 534:8, 534:15, 534:18, 535:4, 535:6, 536:7, 539:13, 541:5, 541:13, 542:2, 542:9, 542:13, 543:1, 544:22, 545:3, 545:6, 545:12, 547:15, 547:24, 548:1, 548:11, 548:12, 550:6, 550:21
**Myspace** [1] - 550:12

## N

**name** [2] - 548:9, 548:10
**necessarily** [4] - 537:12, 542:16, 542:19, 544:21
**need** [18] - 527:8, 527:11, 530:24, 533:21, 537:14, 543:24, 546:25, 550:23, 552:14, 556:9, 556:10, 563:14, 565:11, 565:22, 565:23, 566:23, 567:2, 567:10
**needed** [2] - 519:17, 524:20
**negligence** [16] - 520:22, 527:6, 532:11, 541:1, 541:15, 541:20, 541:21, 542:3, 542:22, 543:14, 544:13, 548:13, 548:16, 553:20, 559:24, 562:2
**negligent** [12] - 517:11, 517:15, 518:3, 520:20, 540:25, 541:14, 541:25, 542:10, 542:13, 543:2, 548:15, 559:23
**neighbor** [1] - 565:19
**nervous** [1] - 511:19
**never** [17] - 512:2, 514:10, 514:14, 515:9, 516:9, 520:1, 525:20, 526:16, 526:17, 526:25, 527:7, 527:9, 529:9, 550:21, 562:11, 562:14, 568:7
**nevertheless** [1] - 520:2
**new** [1] - 511:14
**NEW** [2] - 508:5, 508:22
**Newton** [19] - 512:23, 514:12, 514:13, 514:18, 514:21, 515:10, 516:2, 518:23, 520:4, 520:6, 520:20, 521:6, 521:15, 521:19, 523:25, 527:7, 528:9, 529:1
**next** [10] - 512:5, 517:17, 530:23, 531:1, 531:19, 532:15, 557:10, 558:1, 566:3, 566:14
**nice** [1] - 520:8
**night** [2] - 511:7, 527:13
**nightmares** [1] - 513:11
**NO** [1] - 508:5
**nonexistence** [1] - 537:4
**normal** [5] - 524:22, 524:24, 546:4, 546:9, 549:19
**normally** [1] - 562:14
**note** [3] - 554:2, 555:8, 557:16
**notes** [7] - 539:17, 539:19, 539:20,

539:22, 539:23
**nothing** [17] - 511:21, 515:6, 516:25, 517:1, 517:3, 521:21, 525:4, 525:7, 525:11, 525:12, 526:23, 529:16, 529:24, 529:25, 532:11, 534:22
**notice** [2] - 564:25, 565:12
**noticed** [2] - 525:20, 563:25
**November** [1] - 554:8
**number** [6] - 521:4, 523:23, 536:22, 559:21, 565:10, 566:13
**Number** [1] - 548:8
**numbered** [1] - 569:9
**numbers** [1] - 529:21
**numerical** [1] - 550:22
**numerically** [1] - 543:21
**nursing** [1] - 546:16

## O

**oath** [3] - 534:21, 538:12, 538:15
**object** [2] - 529:7, 539:1
**objection** [10] - 531:7, 531:23, 539:5, 539:12, 553:5, 553:8, 554:21, 555:9, 556:13, 557:11
**objections** [6] - 535:10, 538:24, 539:6, 553:6, 555:13, 555:15
**obligation** [3] - 523:23, 565:1, 565:22
**obligations** [1] - 561:7
**observations** [1] - 519:20
**occasionally** [1] - 535:22
**occurrence** [1] - 541:19
**OF** [2] - 508:1, 508:9
**offer** [4] - 516:6, 516:7, 526:19, 556:10
**offered** [1] - 554:4
**offering** [1] - 516:5
**offers** [1] - 539:1
**office** [3] - 511:11, 511:13, 522:20
**officer** [3] - 549:4, 549:24, 550:25
**OFFICER** [1] - 551:12
**Official** [2] - 569:5, 569:14
**official** [1] - 510:16
**OFFICIAL** [1] - 508:21
**officially** [1] - 567:4
**offshore** [1] - 511:14
**oftentimes** [2] - 561:11, 564:17
**oil** [2] - 526:14, 526:15
**Omega** [21] - 512:22, 515:15, 515:16, 517:10, 518:3, 518:11, 518:14, 526:8, 526:11, 526:18, 528:6, 528:19, 540:2, 540:4, 540:20, 540:25, 541:14, 544:14, 548:7, 548:15, 559:22
**OMEGA** [1] - 508:7
**omission** [1] - 544:25
**omitted** [1] - 557:7
**once** [5] - 527:14, 527:18, 530:21, 533:14, 541:11
**one** [44] - 510:17, 510:22, 511:23, 512:10, 512:13, 513:18, 514:20, 517:7, 518:20, 520:1, 521:4, 522:4, 522:7, 523:23, 527:6, 527:25, 530:3, 530:4, 531:25, 534:9, 534:17, 537:1, 540:3, 541:7, 542:22, 543:11, 548:13, 548:25, 549:2, 551:24, 555:17, 561:6, 561:8, 562:3, 563:18, 563:23, 564:3, 567:19, 567:20, 567:21, 568:2, 568:6
**one-minute** [2] - 510:17, 510:22
**ones** [1] - 512:23
**online** [1] - 565:11
**onshore** [1] - 511:14
**open** [1] - 567:11
**opening** [3] - 513:19, 514:1, 519:12
**operated** [1] - 540:8
**operation** [1] - 542:14
**operations** [1] - 542:11
**opinion** [6] - 535:25, 537:22, 537:23, 538:1, 539:7, 547:18
**opportunity** [3] - 512:6, 534:5, 561:20
**opposed** [1] - 562:5
**opposing** [1] - 533:1
**options** [1] - 529:21
**oral** [1] - 551:24
**ORDER** [2] - 510:4, 559:4
**order** [4] - 520:16, 525:5, 533:8, 558:2
**orders** [1] - 551:9
**ORLEANS** [2] - 508:5, 508:22
**otherwise** [4] - 538:19, 550:21, 551:9, 554:23
**Ott** [1] - 522:21
**overboard** [2] - 523:10, 523:11
**overruled** [1] - 530:19
**overwhelming** [1] - 518:3
**owes** [2] - 541:22, 543:7
**own** [6] - 513:20, 526:16, 528:10, 535:18, 536:2, 547:18
**owned** [1] - 540:8
**owner** [6] - 543:12, 543:16, 543:18, 543:23, 544:6, 544:15

## P

**p.m** [1] - 568:17
**page** [4] - 512:21, 513:23, 529:23, 552:8
**PAGE** [1] - 509:3
**pages** [1] - 529:22
**paid** [7] - 516:12, 516:13, 516:19, 519:17, 526:12, 538:3
**pain** [14] - 513:12, 513:14, 520:13, 520:15, 531:1, 531:2, 531:5, 531:6, 531:21, 532:15, 546:2, 546:20, 546:25, 549:16
**Pam** [1] - 559:18
**panel** [4] - 510:9, 551:14, 559:10, 567:8
**paper** [1] - 534:2
**Parish** [2] - 519:1
**park** [2] - 527:17, 527:22
**parking** [1] - 566:17
**part** [12] - 525:13, 533:2, 534:20, 542:1, 544:13, 545:2, 545:7, 548:17, 551:21, 553:25, 554:5, 559:25
**participate** [1] - 562:16
**participation** [1] - 567:5
**particular** [1] - 541:9
**parties** [5] - 534:21, 538:14, 540:13, 540:17, 551:3
**parties'** [1] - 535:17
**parts** [1] - 543:9
**party** [1] - 545:16
**passageways** [1] - 543:9
**past** [17] - 511:9, 511:17, 529:15, 530:14, 530:20, 530:21, 531:1, 531:5, 546:5, 546:6, 546:7, 546:10, 546:22, 549:9, 549:13, 549:16, 549:20
**path** [1] - 514:17
**patience** [1] - 560:17
**pattern** [3] - 553:19, 553:20, 554:11
**paying** [2] - 518:21, 519:15
**penalties** [1] - 516:16
**pencil** [2] - 529:7, 529:20
**people** [21] - 512:22, 513:4, 514:23, 516:11, 518:25, 519:2, 522:21, 523:16, 525:10, 527:3, 561:11, 561:12, 561:15, 561:20, 565:22, 565:23, 566:8, 567:20
**people's** [1] - 518:19
**Pepper** [3] - 569:3, 569:12, 569:13
**PEPPER** [1] - 508:21
**per** [1] - 510:13
**perform** [3] - 542:25, 543:1, 544:8
**perhaps** [1] - 562:4
**period** [2] - 542:16, 555:24
**permitted** [3] - 536:17, 537:22, 539:16
**person** [10] - 514:11, 514:15, 516:3, 517:21, 520:21, 537:20, 541:16, 541:17, 564:21, 564:23
**persons** [3] - 534:24, 535:2, 543:21
**phone** [3] - 550:9, 566:13
**photo** [2] - 517:22, 517:24
**physical** [10] - 531:2, 531:6, 545:20, 546:2, 546:10, 546:25, 549:16, 549:17, 552:10
**pick** [2] - 522:6
**picked** [2] - 560:20, 560:21
**picking** [1] - 518:19
**picture** [1] - 523:2
**pinned** [1] - 514:9
**pinning** [1] - 515:9
**pipe** [1] - 523:15
**place** [2] - 542:5, 542:7
**PLAINTIFF** [1] - 508:14
**plaintiff** [33] - 519:9, 536:4, 536:7, 539:25, 540:18, 540:22, 541:6, 541:10, 541:13, 542:6, 542:25, 543:1, 544:18, 545:3, 545:6, 545:14, 545:22, 545:25, 546:11, 546:17, 546:20, 546:22, 547:3, 547:6, 547:8, 547:11, 548:16, 548:21, 549:7, 552:15, 553:6, 559:23, 560:3
**plaintiff's** [10] - 536:14, 540:24, 541:2, 542:1, 542:8,

543:4, 546:3, 546:9, 549:18, 552:9
**plant** [1] - 521:3
**plate** [1] - 513:10
**play** [1] - 534:19
**played** [1] - 545:7
**pleasures** [2] - 546:4, 549:19
**podium** [2] - 510:24, 563:5
**point** [14] - 510:8, 511:21, 533:21, 535:12, 551:13, 552:23, 554:17, 555:17, 556:13, 556:20, 557:8, 558:6, 559:9, 567:7
**POINT** [11] - 517:18, 540:3, 540:6, 540:7, 540:10, 540:21, 541:3, 543:6, 548:8, 548:20, 560:2
**pointing** [1] - 521:19
**political** [2] - 535:1, 535:3
**poll** [1] - 560:9
**port** [1] - 527:22
**portion** [1] - 538:6
**position** [5] - 512:1, 545:22, 556:2, 557:17, 563:20
**positions** [1] - 564:5
**possible** [2] - 538:20, 566:5
**possibly** [1] - 511:25
**post** [2] - 523:25, 524:1
**pounds** [1] - 528:17
**POYDRAS** [1] - 508:22
**practice** [5] - 542:15, 542:18, 542:19, 562:22
**praise** [1] - 518:16
**prejudice** [2] - 534:19, 539:4
**prepare** [2] - 567:15, 567:16
**prepared** [7] - 521:11, 547:22, 553:24, 554:21, 563:2, 563:7, 567:23
**preponderance** [12] - 518:2, 536:6, 536:9, 536:14, 537:6, 542:24, 545:12, 546:1, 548:14, 548:20, 559:22, 560:1
**prerogative** [1] - 520:22
**present** [7] - 526:18, 538:11, 538:15, 538:21, 549:16, 549:19, 561:24
**presentation** [2] - 563:4, 563:9
**presented** [4] - 538:7, 538:12, 547:7, 552:18
**preside** [1] - 534:11
**presiding** [1] - 565:9
**press** [4] - 565:2, 565:3, 565:7, 565:14
**pretrial** [3] - 554:17, 556:22, 563:2
**primary** [1] - 533:2
**priority** [1] - 521:4
**prison** [3] - 519:24, 519:25, 520:3
**private** [1] - 535:2
**probable** [1] - 545:10
**problems** [1] - 555:25
**Procedure** [1] - 556:17
**proceed** [3] - 510:11, 548:19, 549:1
**PROCEEDINGS** [4] - 508:9, 508:24, 510:1, 559:1
**proceedings** [7] - 510:8, 551:13, 558:6, 559:9, 567:7, 568:17, 569:8
**process** [4] - 511:14, 511:17, 511:20, 565:15
**produced** [3] - 517:24, 517:25, 536:12
**PRODUCED** [1] - 508:25
**productive** [1] - 526:22
**proffer** [4] - 553:10, 553:21, 554:1, 555:8
**PROFFER** [1] - 509:10
**Proffer** [1] - 553:25
**profits** [1] - 514:23
**profusely** [1] - 521:17
**progress** [1] - 546:9
**promise** [4] - 512:18, 513:7, 513:15, 534:20
**promises** [2] - 512:15, 515:1
**prompt** [1] - 562:17
**promptly** [1] - 510:11
**proof** [2] - 536:13, 537:2
**proper** [1] - 544:4
**properly** [2] - 539:2, 552:7
**Protein** [13] - 517:10, 518:11, 518:14, 528:6, 540:2, 540:4, 540:20, 540:25, 541:14, 544:14, 548:7, 548:15, 559:22
**PROTEIN** [1] - 508:7
**prove** [6] - 513:21, 536:7, 536:22, 537:3, 541:6, 541:13
**proved** [1] - 513:16
**proven** [1] - 536:9
**proves** [2] - 541:7, 541:9
**provide** [8] - 542:5, 543:12, 543:16, 543:18, 544:2, 544:4, 544:7, 550:7
**provided** [1] - 519:9
**provides** [1] - 541:9
**providing** [1] - 541:23
**proving** [1] - 536:5
**proximate** [5] - 544:10, 545:5, 546:13, 548:22, 560:4
**prudence** [1] - 543:18
**prudent** [2] - 541:15, 541:17
**pull** [1] - 522:17
**pulls** [1] - 527:21
**punishment** [1] - 545:16
**purpose** [2] - 517:19, 564:4
**pursued** [1] - 556:2
**pursuits** [2] - 546:4, 549:19
**put** [17] - 511:23, 511:24, 512:4, 517:22, 519:22, 521:20, 522:9, 523:13, 527:21, 529:8, 529:20, 530:9, 532:17, 556:9, 557:20, 563:3, 563:9
**puts** [3] - 512:1, 527:21, 527:23
**putting** [3] - 514:23, 519:23, 562:25

## Q

**questioned** [1] - 538:14
**questionnaire** [1] - 566:2
**questions** [16] - 518:1, 520:24, 522:3, 522:5, 525:17, 535:23, 538:9, 538:16, 548:4, 548:12, 548:25, 549:2, 550:20, 561:2, 563:6, 564:9
**Quintanilla** [1] - 533:13
**quit** [2] - 524:4, 527:3
**quite** [4] - 519:13, 522:5, 556:25, 561:3
**quits** [1] - 524:5

## R

**RACCOON** [11] - 517:18, 540:3, 540:6, 540:7, 540:10, 540:21, 541:3, 543:6, 548:8, 548:20, 560:2
**racing** [1] - 527:17
**racks** [1] - 517:23
**radio** [2] - 521:2, 521:6
**rail** [2] - 523:10, 523:13
**raise** [1] - 556:1
**raised** [7] - 552:16, 554:14, 554:16, 554:17, 555:21, 556:1, 557:15
**ran** [1] - 528:24
**rare** [2] - 551:9, 561:11
**rate** [1] - 557:16
**rather** [5] - 534:1, 534:2, 541:7, 544:21, 563:11
**re** [1] - 547:17
**re-examine** [1] - 547:17
**reach** [3] - 528:5, 536:19, 547:14
**reached** [3] - 550:18, 551:7, 559:12
**reaching** [1] - 547:23
**read** [12] - 521:23, 521:25, 522:4, 524:13, 538:16, 548:5, 548:10, 551:22, 552:2, 552:9, 559:20, 564:25
**reading** [1] - 521:24
**ready** [4] - 510:11, 510:25, 549:4, 549:24
**real** [1] - 562:24
**really** [14] - 515:17, 521:24, 532:5, 561:6, 561:8, 561:17, 561:21, 562:17, 563:9, 564:21, 565:22, 566:7, 566:13, 566:15
**Realtime** [2] - 569:3, 569:13
**REALTIME** [1] - 508:21
**reason** [4] - 536:20, 553:12, 568:3, 568:6
**reasonable** [5] - 520:21, 536:17, 542:9, 546:10, 546:15
**reasonably** [15] - 517:19, 541:15, 541:17, 542:5, 542:7, 542:14, 542:17, 543:11, 543:17, 543:25, 544:1, 544:4, 544:5, 545:10, 546:12
**rebuttal** [9] - 510:14, 510:23, 531:10, 532:2, 532:25, 533:3, 533:7
**REBUTTAL** [2] - 509:7, 528:14
**receive** [1] - 547:11
**received** [4] - 536:11, 557:3, 557:11, 568:7
**recess** [2] - 550:15, 558:6
**reckless** [1] - 528:9
**recollection** [3] - 535:19, 539:21, 539:24
**recommend** [1] - 565:4
**record** [15] - 535:8, 553:10, 554:2, 554:3, 555:7, 555:8, 556:3, 556:9, 556:13, 557:16, 557:17, 557:20, 567:10, 567:11, 569:8
**RECORDED** [1] - 508:24
**recorded** [3] - 513:20, 538:9, 538:15
**records** [2] - 516:9,

529:23
**recover** [4] - 541:7, 541:8, 541:10, 562:2
**recoverable** [1] - 545:18
**red** [1] - 522:9
**reflect** [2] - 540:16, 552:2
**reflected** [1] - 552:18
**reflection** [1] - 567:22
**refutes** [1] - 529:16
**regard** [5] - 541:12, 551:17, 553:3, 555:18, 566:19
**regarding** [2] - 552:3, 554:14
**regardless** [2] - 536:10, 536:12
**Registered** [1] - 569:3
**regularly** [1] - 538:4
**rehab** [1] - 525:25
**rehabilitation** [2] - 533:13, 533:14
**relate** [1] - 531:16
**release** [1] - 560:14
**rely** [4] - 537:25, 539:19, 539:21
**remember** [7] - 514:7, 514:22, 516:22, 517:4, 517:22, 525:25, 535:10
**remind** [2] - 565:12, 565:21
**reminder** [1] - 565:1
**repeat** [1] - 518:22
**reply** [1] - 551:1
**report** [11] - 514:13, 514:14, 515:10, 521:3, 521:10, 521:21, 521:23, 565:8, 565:23, 566:1, 567:3
**reported** [2] - 521:19, 560:21
**Reporter** [6] - 569:3, 569:4, 569:5, 569:13, 569:14
**REPORTER** [2] - 508:21, 508:21
**reporter** [1] - 538:15
**REPORTER'S** [1] - 569:1
**reporting** [1] - 561:5
**reports** [1] - 516:22
**represent** [2] - 547:25, 550:24
**representation** [1] - 557:9
**representing** [1] - 538:14
**represents** [2] - 538:5, 563:21
**request** [3] - 552:22, 555:11, 555:19
**require** [1] - 546:17
**required** [9] - 537:23, 541:6, 542:4, 543:23, 544:2, 544:4, 544:8, 546:13, 551:8
**requires** [3] - 516:14, 537:6, 553:14
**research** [1] - 550:14
**reserve** [1] - 510:14
**resolve** [2] - 561:12, 561:22
**respond** [4] - 533:9, 535:23, 551:2, 556:14
**response** [2] - 551:4, 556:10
**responses** [1] - 548:12
**responsibilities** [2] - 561:3, 561:6
**responsible** [2] - 514:15, 542:21
**rest** [2] - 513:14, 516:19
**restore** [1] - 545:22
**restricted** [1] - 545:19
**rests** [1] - 543:4
**resubmit** [1] - 568:7
**result** [6] - 545:9, 546:13, 546:23, 549:8, 567:21, 567:24
**results** [1] - 544:21
**retire** [2] - 550:2, 551:10
**return** [4] - 529:25, 549:4, 549:24, 557:25
**reveal** [1] - 550:20
**review** [4] - 534:6, 554:19, 554:20, 555:22
**reviewing** [1] - 538:3
**rise** [6] - 510:7, 551:12, 558:5, 559:7, 567:6, 568:16
**river** [1] - 527:19
**RMR** [2] - 508:21, 569:13
**ROBERT** [1] - 508:14
**room** [15] - 522:15, 547:24, 550:2, 550:11, 551:10, 551:17, 557:9, 563:19, 563:21, 563:24, 563:25, 564:2, 564:4, 564:8, 566:16
**ROOM** [1] - 508:22
**rope** [28] - 513:24, 513:25, 517:2, 517:3, 517:12, 517:19, 522:11, 522:12, 522:13, 522:21, 522:24, 523:2, 523:3, 523:7, 523:12, 523:15, 523:19, 523:23, 523:24, 524:3, 524:19, 524:22, 524:23, 524:24, 525:11, 528:5, 529:6
**round** [2] - 523:3, 528:5
**Rule** [3] - 553:14, 553:17, 556:17
**ruled** [2] - 555:5, 556:12
**Rules** [1] - 556:17
**rules** [1] - 544:23
**ruling** [1] - 556:16
**run** [1] - 528:3
**running** [2] - 523:15

## S

**s/Cathy** [1] - 569:12
**sacrosanct** [1] - 521:4
**sad** [1] - 512:4
**safe** [13] - 514:19, 515:19, 515:20, 524:12, 524:14, 524:17, 542:5, 542:7, 542:8, 542:14, 542:17, 544:16
**safer** [1] - 512:16
**safety** [4] - 512:15, 514:23, 514:24, 541:24
**Sarkies** [2] - 524:20, 525:9
**satisfied** [1] - 567:21
**saw** [2] - 513:22, 520:23
**scale** [2] - 517:14, 518:2
**scars** [1] - 532:14
**scheme** [1] - 552:20
**scope** [1] - 542:23
**screws** [1] - 513:10
**seaman** [1] - 540:13
**seaman's** [1] - 542:21
**seamen** [2] - 541:23, 542:4
**seated** [4] - 510:10, 551:15, 559:11, 567:9
**seaworthy** [5] - 543:10, 543:12, 543:16, 543:19
**second** [10] - 512:2, 512:19, 519:19, 520:5, 520:6, 531:25, 541:2, 543:4, 544:11, 551:25
**seconds** [3] - 518:6, 528:22, 528:24
**secure** [3] - 524:13, 524:14, 524:15
**SECURITY** [1] - 551:12
**security** [3] - 549:4, 549:24, 550:25
**see** [5] - 517:2, 526:17, 530:14, 530:18, 552:14
**seeking** [2] - 540:19, 565:8
**select** [1] - 550:4
**send** [7] - 515:23, 515:25, 516:1, 516:2, 551:18, 558:2
**sense** [3] - 514:14, 519:4, 536:20
**sent** [6] - 516:3, 517:5, 521:10, 521:11, 521:21, 551:17
**separate** [2] - 531:3, 540:23
**separately** [1] - 541:5
**serve** [1] - 565:22
**served** [1] - 566:9
**service** [7] - 550:10, 550:11, 560:15, 561:5, 564:7, 565:18, 566:7
**set** [2] - 533:25, 557:10
**seven** [1] - 513:10
**several** [1] - 563:15
**severe** [3] - 513:9, 519:13, 532:9
**shall** [1] - 534:15
**shepherd** [1] - 511:16
**ship** [2] - 543:8, 543:24
**shipowner** [3] - 543:7, 544:2, 544:12
**short** [1] - 553:18
**show** [7] - 512:21, 513:13, 513:22, 516:22, 539:3, 545:4, 545:6
**showed** [1] - 512:13
**showing** [1] - 526:21
**shown** [2] - 537:8, 538:16
**shuffle** [1] - 568:7
**side** [10] - 510:13, 527:19, 529:17, 535:14, 539:1, 557:6, 567:20, 567:21
**sides** [1] - 561:16
**sign** [7] - 549:3, 549:11, 549:13, 549:14, 549:15, 549:22, 549:23
**signature** [1] - 549:25
**signed** [2] - 551:16, 560:7
**significance** [1] - 537:17
**significant** [2] - 535:13, 538:6
**similar** [7] - 530:24, 532:18, 532:19, 534:25, 541:17, 542:12, 556:25
**simple** [1] - 537:12
**simply** [4] - 537:5, 537:16, 560:24, 564:21
**single** [5] - 527:24, 529:23, 534:17, 536:21, 536:24
**sit** [3] - 526:23, 560:20, 560:24
**sitting** [2] - 561:5, 561:7
**situation** [1] - 526:18
**six** [3] - 513:14, 531:19, 531:20
**skilled** [1] - 525:18
**skip** [2] - 531:10, 549:3
**sleeping** [1] - 527:13
**slip** [2] - 525:6, 525:7
**smart** [1] - 550:9
**Smith** [9] - 512:22, 512:25, 514:5, 514:22, 516:1, 517:19, 525:17
**snowstorm** [1] - 518:24
**society** [1] - 562:9
**sole** [1] - 539:9
**solely** [1] - 547:20
**someone** [5] - 515:24, 542:20, 561:25, 562:1, 564:18
**sometimes** [5] -

518:17, 523:6, 538:24, 564:12, 564:13
**sons** [1] - 565:19
**soon** [2] - 524:3, 558:4
**sorry** [2] - 528:7, 531:8
**sort** [1] - 511:16
**sound** [2] - 520:10, 528:20
**soundproofed** [1] - 563:25
**sounds** [1] - 520:10
**special** [2] - 537:20, 547:22
**specifically** [1] - 540:22
**speculate** [1] - 539:15
**speculation** [1] - 545:17
**speed** [3] - 514:23, 527:18, 528:1
**speeding** [2] - 528:2, 528:22
**spiral** [2] - 512:5, 520:10
**spotter** [5] - 513:1, 517:12, 527:9, 527:10, 527:11
**spouse** [2] - 563:16, 565:19
**staffs** [1] - 563:8
**stand** [6] - 515:6, 520:8, 533:21, 535:3, 538:11, 538:22
**standard** [1] - 547:4
**standing** [3] - 523:1, 534:24, 541:19
**starboard** [1] - 527:22
**start** [5] - 518:19, 518:23, 521:19, 553:5, 565:20
**starts** [1] - 521:22
**State** [1] - 569:4
**state** [4] - 522:2, 534:15, 537:22, 547:9
**statement** [13] - 513:19, 513:20, 513:22, 516:25, 517:3, 517:4, 521:25, 522:4, 524:4, 524:10, 527:7, 565:8
**statements** [4] - 514:1, 519:12, 535:10, 535:15
**STATES** [2] - 508:1, 508:10
**States** [3] - 548:6, 569:5, 569:14
**stating** [1] - 534:17
**stations** [1] - 534:25
**stayed** [1] - 518:13
**STENOGRAPHY** [1] - 508:24
**step** [2] - 523:19, 523:24
**stepped** [6] - 513:19, 513:21, 513:24, 517:1, 517:3
**stepping** [1] - 514:12
**still** [3] - 530:13, 557:6, 567:11
**stipulated** [1] - 540:3
**stipulations** [1] - 540:16
**Stoller** [1] - 517:21
**stop** [1] - 510:18
**story** [1] - 522:7
**stray** [1] - 557:23
**streamlined** [1] - 563:4
**street** [1] - 526:25
**STREET** [3] - 508:15, 508:19, 508:22
**stretch** [1] - 533:21
**strict** [1] - 553:17
**strongly** [1] - 552:15
**stuff** [2] - 522:9, 533:1
**stupid** [1] - 521:18
**subdivisions** [1] - 535:3
**subject** [2] - 537:19, 547:8
**submission** [2] - 554:5, 554:6
**submit** [3] - 557:2, 561:24, 562:5
**submitted** [2] - 554:11, 568:1
**substantial** [2] - 545:7, 545:8
**subtract** [1] - 510:18
**sued** [1] - 525:14
**suffered** [5] - 529:14, 540:21, 545:13, 547:4, 549:8
**suffering** [10] - 531:1, 531:2, 531:5, 531:6, 532:15, 546:2, 546:20, 546:25, 549:16, 549:20
**sufficient** [2] - 536:21, 544:7
**suggests** [1] - 527:8
**suitable** [2] - 544:4, 544:16
**SUITE** [2] - 508:15, 508:19
**summary** [1] - 544:6
**summons** [1] - 565:20
**supply** [1] - 543:19
**supposed** [3] - 524:15, 563:2, 567:24
**surface** [2] - 524:25, 525:12
**surgeries** [1] - 513:9
**sustained** [2] - 539:12, 546:20
**switched** [1] - 517:2
**sworn** [3] - 535:8, 538:9, 547:13
**sympathy** [3] - 520:16, 526:22, 534:19
**symptoms** [1] - 530:5
**system** [7] - 518:14, 518:15, 518:21, 561:21, 562:4, 563:24
**systems** [1] - 561:9

## T

**tangible** [1] - 545:21
**task** [2] - 542:25, 543:22
**tasks** [2] - 544:1, 544:8
**tax** [2] - 547:9, 547:10
**taxes** [1] - 547:12
**technical** [3] - 537:19, 537:21, 537:22
**telephone** [1] - 550:9
**ten** [5] - 513:14, 520:13, 531:20
**tend** [1] - 537:3
**tendering** [1] - 553:18
**term** [6] - 527:10, 527:24, 535:7, 544:11, 548:22, 560:4
**terrible** [1] - 566:17
**testified** [4] - 514:4, 536:23, 537:8, 538:21
**testifies** [1] - 538:4
**testify** [1] - 538:11
**testifying** [1] - 538:4
**testimony** [21] - 518:20, 523:2, 534:11, 535:8, 536:10, 536:17, 536:21, 537:1, 537:10, 537:11, 538:5, 538:7, 538:12, 538:16, 538:17, 539:1, 539:5, 539:24, 552:17, 552:21, 553:1
**text** [1] - 550:10
**thanked** [1] - 560:16
**THE** [55] - 508:10, 508:14, 508:18, 509:8, 510:7, 510:10, 510:16, 511:5, 517:7, 518:5, 518:10, 527:25, 528:12, 530:19, 531:8, 531:13, 531:16, 531:25, 532:2, 532:25, 533:11, 533:16, 533:19, 551:12, 551:15, 552:7, 552:24, 553:9, 554:1, 555:12, 555:21, 556:6, 556:8, 556:12, 556:20, 557:23, 558:5, 559:7, 559:8, 559:11, 559:14, 559:15, 559:16, 559:17, 559:20, 560:12, 567:2, 567:6, 567:9, 567:14, 568:4, 568:9, 568:12, 568:15, 568:16
**therefore** [1] - 547:10
**they've** [4] - 515:17, 562:24, 567:23
**thinking** [3] - 511:6, 527:12, 563:6
**thinks** [1] - 528:19
**third** [1] - 513:8
**thousand** [1] - 529:22
**thousands** [1] - 516:16
**three** [16] - 511:8, 512:7, 513:4, 513:9, 513:20, 514:3, 515:23, 517:24, 523:1, 523:7, 530:13, 540:7, 549:1, 549:3, 549:6, 552:10
**threw** [1] - 524:3
**throttle** [1] - 524:6
**thumb** [1] - 529:6
**tie** [1] - 524:3
**timekeeper** [1] - 510:16
**timeliness** [1] - 555:18
**tip** [2] - 517:13, 517:14
**tipping** [1] - 518:2
**TO** [2] - 510:4, 559:4
**today** [6] - 511:18, 514:4, 549:10, 549:14, 566:12, 567:18
**together** [7] - 519:22, 519:23, 529:9, 529:20, 562:21, 562:25, 563:3
**took** [5] - 519:16, 533:6, 534:21, 563:19, 563:20
**tools** [1] - 543:9
**topic** [1] - 554:16
**totals** [1] - 530:8
**touch** [1] - 557:24
**tough** [1] - 525:22
**trained** [1] - 543:1
**training** [1] - 537:20
**transcribed** [1] - 517:4
**transcript** [2] - 552:14, 569:7
**TRANSCRIPT** [2] - 508:9, 508:24
**treated** [1] - 535:4
**treatment** [2] - 530:24, 546:16
**TRIAL** [1] - 508:9
**trial** [21] - 534:9, 534:11, 534:13, 535:2, 535:21, 536:2, 538:7, 538:10, 538:13, 538:17, 538:23, 539:17, 550:17, 551:24, 552:17, 554:8, 554:17, 562:25, 563:13, 563:15, 567:20
**tried** [6] - 524:3, 524:20, 556:24, 557:13, 563:8, 566:18
**trip** [1] - 525:6
**true** [13] - 517:6, 525:18, 525:19, 528:25, 529:1, 529:17, 529:18, 536:8, 540:18, 569:7
**truth** [1] - 537:13
**try** [5] - 522:7, 529:8, 560:25, 561:23, 563:9
**trying** [4] - 523:18, 527:6, 529:20, 547:2
**Tuesday** [1] - 555:23
**Twitter** [1] - 550:12

**two** [29] - 511:24, 514:5, 515:12, 516:22, 517:25, 518:1, 521:23, 523:1, 523:7, 525:15, 529:21, 532:14, 534:9, 536:25, 540:5, 540:22, 548:19, 548:25, 549:2, 560:1, 560:18, 562:10, 562:13, 562:21, 563:7, 563:12, 564:12, 565:18
**TX** [1] - 508:16
**tying** [1] - 528:10
**Tylenol** [1] - 520:15
**type** [4] - 516:7, 522:22, 532:4, 562:2
**types** [1] - 536:25
**typically** [1] - 557:8

## U

**unanimous** [4] - 547:23, 548:1, 548:12, 550:18
**under** [21] - 515:24, 516:4, 520:21, 534:12, 538:10, 538:12, 538:15, 540:11, 540:12, 540:23, 540:24, 541:12, 541:17, 541:25, 542:2, 542:3, 542:14, 542:17, 543:6, 544:24, 565:14
**underestimate** [1] - 562:9
**understood** [2] - 540:14, 553:11
**undisputed** [3] - 514:24, 529:15, 530:21
**unduly** [1] - 539:22
**unfit** [1] - 544:9
**unfortunately** [1] - 566:19
**unimportant** [1] - 537:18
**unit** [2] - 531:23, 532:1
**United** [3] - 548:6, 569:5, 569:14
**UNITED** [2] - 508:1, 508:10
**unless** [3] - 539:7, 550:21, 551:8
**unreasonable** [1] - 542:19
**unsafe** [4] - 514:20, 514:23, 542:18, 542:19
**unseaworthiness** [9] - 541:3, 543:3, 543:5, 544:19, 544:23, 545:3, 548:13, 548:22, 560:3
**unseaworthy** [10] - 517:18, 518:4, 543:13, 543:20, 544:12, 544:17, 545:4, 545:5, 548:21, 560:2
**up** [45] - 510:14, 512:14, 512:18, 513:7, 513:16, 513:17, 514:2, 514:6, 514:25, 515:1, 515:6, 515:14, 516:23, 517:4, 517:22, 518:18, 519:12, 522:9, 523:7, 523:12, 526:2, 527:15, 528:5, 528:10, 529:4, 529:12, 529:15, 529:17, 530:6, 531:20, 532:6, 532:10, 532:19, 532:20, 533:21, 537:24, 547:19, 552:11, 555:17, 556:23, 563:6

## V

**value** [4] - 546:11, 546:15, 546:24, 547:2
**verdict** [31] - 517:8, 520:23, 547:22, 547:24, 547:25, 548:5, 550:3, 550:14, 550:18, 551:7, 551:18, 553:4, 553:7, 553:24, 553:25, 554:13, 554:20, 555:1, 555:13, 555:16, 555:25, 556:23, 557:3, 557:19, 558:1, 559:12, 559:21, 560:12, 563:21, 567:16, 568:2
**VERDICT** [1] - 559:19
**Verdict** [1] - 548:10
**VERDICT.................................................** [1] - 509:11
**version** [1] - 553:21
**versus** [3] - 526:14, 548:7, 552:3
**vessel** [22] - 517:17, 518:3, 524:14, 524:15, 540:2, 541:3, 543:5, 543:7, 543:10, 543:12, 543:16, 543:17, 543:19, 543:20, 543:23, 543:24, 544:3, 544:7, 544:8, 544:12, 544:17
**via** [1] - 557:3
**violence** [1] - 561:19
**visit** [1] - 566:12
**vocational** [3] - 525:25, 533:13, 533:14
**vote** [3] - 561:7, 563:19, 565:16

## W

**wage** [1] - 529:20
**wages** [5] - 529:11, 529:12, 529:14, 530:6, 532:19
**wait** [3] - 526:20, 526:23, 532:25
**waits** [1] - 527:20
**walk** [2] - 511:15, 531:22
**walked** [1] - 523:25
**walking** [3] - 524:6, 524:25, 525:12
**wants** [1] - 564:14
**warning** [3] - 510:17, 510:21, 510:23
**watch** [1] - 523:24
**watched** [1] - 520:13
**website** [1] - 550:12
**WEDNESDAY** [3] - 508:6, 510:2, 559:2
**week** [2] - 518:12, 563:11
**weeks** [3] - 517:24, 561:19, 566:3
**weighed** [1] - 538:19
**weight** [3] - 539:8, 539:10, 539:23
**welds** [1] - 517:24
**Wes** [4] - 512:22, 513:3, 514:6, 515:25
**Westbank** [1] - 527:13
**whatsoever** [1] - 564:6
**WHEREUPON** [6] - 510:8, 551:13, 558:6, 559:9, 567:7, 568:17
**whole** [8] - 511:8, 530:2, 534:18, 542:1, 545:1, 545:22, 548:17, 559:24
**wife** [1] - 522:21
**William** [5] - 536:5, 540:1, 540:3, 540:19, 548:7
**WILLIAM** [1] - 508:4
**win** [1] - 548:4
**wires** [1] - 513:11
**wish** [1] - 530:12
**witness** [29] - 512:17, 515:5, 515:6, 515:7, 525:23, 535:22, 536:21, 536:24, 537:8, 537:11, 537:12, 537:13, 537:14, 537:22, 537:24, 538:1, 538:2, 538:3, 538:5, 538:9, 538:10, 538:11, 538:14, 538:20, 538:21, 539:13, 539:15, 564:15
**witness'** [2] - 537:10, 538:12
**witnesses** [12] - 512:12, 512:20, 512:21, 518:21, 525:16, 525:24, 535:9, 536:10, 536:22, 539:10, 561:15
**wonder** [1] - 518:18
**wondering** [1] - 560:22
**word** [2] - 527:10, 541:21
**wording** [1] - 539:14
**words** [7] - 513:7, 513:16, 513:20, 521:18, 536:6, 536:19, 552:11
**worker** [3] - 514:19
**works** [1] - 528:17
**world** [1] - 523:19
**worn** [1] - 523:5
**worse** [1] - 512:7
**worst** [1] - 529:21
**worth** [4] - 532:13, 532:14, 532:16, 534:25
**wrap** [1] - 532:6
**wrapped** [3] - 522:11, 522:12, 522:13
**wrapping** [1] - 522:16
**write** [3] - 515:10, 521:22, 551:6
**writing** [2] - 551:1, 554:11
**written** [5] - 533:25, 534:3, 550:24, 551:22, 552:9
**wrongful** [1] - 546:18
**wrote** [2] - 514:2, 521:3
**Wynne** [8] - 510:13, 510:22, 517:7, 518:18, 520:12, 525:20, 528:13, 553:5
**WYNNE** [23] - 508:14, 510:15, 511:2, 511:6, 517:8, 528:15, 530:18, 530:20, 531:12, 531:14, 531:18, 532:7, 533:10, 533:12, 533:18, 552:6, 553:8, 556:10, 556:16, 557:21, 560:10, 566:25, 567:12
**Wynne's** [1] - 526:1
**WYNNE...............** [1] - 509:7
**WYNNE........................** [1] - 509:5

## Y

**y'all** [9] - 518:12, 518:13, 518:15, 518:16, 520:14, 521:23, 523:16
**yard** [1] - 520:9
**year** [10] - 511:9, 516:13, 516:19, 526:3, 526:5, 526:8, 526:10, 530:7, 530:25
**years** [23] - 512:5, 512:7, 514:5, 515:11, 515:12, 515:17, 517:25, 518:17, 518:24, 521:1, 524:11, 525:15, 526:11, 528:10, 528:17,

528:18, 530:13, 530:22, 530:23, 531:19, 531:20, 532:14, 532:15
**yeoman's** [1] - 562:25
**yesterday** [14] - 553:15, 553:22, 554:3, 554:12, 554:15, 554:18, 554:25, 555:5, 555:6, 555:7, 555:17, 556:14, 557:11
**yourself** [2] - 547:15, 564:7
**yourselves** [5] - 518:25, 519:8, 519:22, 561:25, 564:1
**YouTube** [1] - 550:12